**UNITED STATES of America, Appellant,**

v.

**Samuel EVANS, Guriel Eisenberg, Rafael Israel Eisenberg, William Northrop, Abraham Bar'am, Nico Minardos, Alfred Flearmoy, Herman Moll, Ralph Kopka, and Hans Bihn, Defendants–Appellees.**

**No. 673, Docket 87–1400.**

United States Court of Appeals, Second Circuit.

Argued Jan. 25, 1988.

Decided April 7, 1988.

Lorna G. Schofield, New York City, Asst. U.S. Atty. for S.D. New York (Rudolph W. Giuliani, U.S. Atty. for S.D. New York, Aaron R. Marcu, Asst. U.S. Atty., of counsel), for appellant.

Lawrence S. Bader, New York City (Grand & Ostrow, J. Kelly Strader, of counsel), for defendant-appellee Evans.

Before FEINBERG, Chief Judge, MESKILL and MAHONEY, Circuit Judges.

FEINBERG, Chief Judge:

This case arises out of defendants' alleged efforts to arrange sales of arms from various foreign countries to Iran, and, in furtherance of that scheme, to deceive the United States about the true destination of the arms. The government brings an inter-

locutory appeal, pursuant to 18 U.S.C. § 3731, from an order of the United States District Court for the Southern District of New York, Leonard B. Sand, J., dismissing 46 counts of a 55–count indictment charging defendants with mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. The government raises two issues: (1) whether, to make out a violation of the mail and wire fraud statutes, the government must show that the goal of the fraudulent scheme was to deprive the party deceived (rather than someone else) of money or property, and (2) whether the right of the United States to veto sales of U.S.-made or licensed weapons by one foreign government to another is a property right for wire and mail fraud purposes. For the reasons stated below, we agree with the district court that the government must prove that the scheme aimed at depriving it of money or property, and that the right to control future arms sales is not a property right for this purpose. We therefore affirm the decision of the district court dismissing the wire and mail fraud counts of the indictment.

## I. Background

The government alleges that Samuel Evans, general counsel to Adnan Khashoggi (a leading figure in the now well-publicized Iran–Contra affair), and the other defendants planned to sell to Iran arms that were manufactured in, or by license from, the United States and that are now owned by various foreign countries by deceiving the United States about the true identity of the country purchasing the arms in order to obtain the necessary government approval for the transaction. Specifically, defendants are charged with conspiring to provide and providing false end user certificates and other documents to the United States, hoping to deceive the government into thinking the arms were being sold to an acceptable country. In fact, the arms were destined for Cyrus Hashemi, a government agent pretending to be an Iranian buyer. Hashemi's negotiations with defendants were tape-recorded, and the undercover operation was terminated before any arms changed hands. See *United States v. Ev-*

*ans*, 667 F.Supp. 974 (S.D.N.Y.1987) (ruling on various motions). The arms involved, which the government values at over $2 billion, are a frightening array and include missiles, fighter aircraft, helicopters, battle tanks, guns, ammunition, cameras, radar, radios, engines and spare parts.

The original indictment in this case was returned in May 1986 and was followed by five superseding indictments, the latest of which ("the indictment") was filed in July 1987. Counts one to four of the indictment allege conspiracies to violate the Arms Export Control Act, 22 U.S.C. § 2751, et seq., and to make false statements in connection with proposed arms sales in violation of 22 U.S.C. § 2778(c) and 18 U.S.C. § 1001. All defendants are charged in at least one of these counts. Counts 5 to 48 charge various defendants with wire fraud, 18 U.S.C. § 1343, and counts 49 and 50 charge mail fraud, 18 U.S.C. § 1341. (We hereafter refer to the wire and mail fraud counts collectively as the "federal fraud" counts, and, because the statutes share the same relevant language, we apply the same analysis to both sets of offenses. See *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987); *United States v. Covino*, 837 F.2d 65, 71 (2d Cir.1988)). Finally, counts 51 to 55 charge various defendants with violating the Arms Export Control Act, 22 U.S.C. § 2778(c), by making false statements on applications and licenses.

The only counts at issue in this appeal are the federal fraud counts, which are stated in the following pattern: One paragraph charges defendants with having "devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations"; a later paragraph charges that "it was in part the object of this scheme ... that the defendants ... would obtain by fraud ... (a) property, to wit, the U.S. Defense Articles listed in this paragraph, among others, for Iran, and (b) money, to wit, commissions for themselves from the sale of said U.S. Defense Articles." Another paragraph charges that the fraud was that defendants

"would make and cause to be made to the United States Department of State or Defense false statements regarding the ultimate destination of the above described U.S. Defense Articles." Succeeding paragraphs list acts of wire and mail use.

Evans, joined by the other defendants, challenged the federal fraud counts. Evans argued that *McNally v. United States,* — U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), requires that the party deceived —here the United States—be deprived of money or property, and that the indictment fails to so allege. Specifically, defendants pointed out that the "property" involved— the weapons—is not alleged to belong to the United States; evidently, some of the weapons were sold directly by their manufacturers to foreign governments, and even those that may have once belonged to the United States are now owned by foreign countries. Moreover, the "money" involved—the commissions—was to be paid by the recipient governments, not by the United States.

Prior to oral argument on the correct interpretation of *McNally,* Judge Sand sent a letter to the parties asking them also to address what we hereafter call the "alienation theory"—"whether the 'right' of the United States to control future 'alienation' of armaments may properly be classified as a 'property right'" for purposes of the federal fraud statutes. Broadly speaking, the limits on alienation that Judge Sand referred to prohibit a foreign country from transferring United States arms to another foreign country without the consent of the United States. These restrictions are created either by a statutorily-required clause in the contract between the United States seller and the original foreign buyer, see 22 U.S.C. § 2753(a)(2), or by regulation, see, e.g., 22 C.F.R. §§ 123.9(a), 123.10(d). See generally *United States v. Evans,* 667 F.Supp. at 982–86.

After briefing and oral argument, Judge Sand rendered an oral decision from the bench on July 30, 1987. He held that *McNally* requires that the defendants have planned that the victim of the deception— here, the United States—lose money or property, and that the interest of the United States in the alienation of arms is not property for *McNally* purposes. Since the United States, although deceived, lost no money or property, the court granted defendants' motion to strike the federal fraud counts. However, the court expressed some doubts about the correctness of its ruling on the alienation theory. It called the question "close and difficult," and noted that "[w]ere the court to require the defendants to stand trial on all counts and were the mail and wire fraud counts ultimately to be held invalid," a new trial would have been required since "asking a jury to return 46 [extraneous] verdicts ... would have a very significant impact on the trial." The judge concluded "that on balance the preferred procedure and the procedure with which the court is comfortable on the merits" is to find that the interest of the United States is not a property right and to strike the federal fraud counts. This appeal followed. No trial date has been set for the remaining counts pending resolution of this appeal.

## II. Whose Property Must be Taken

■ The federal fraud statutes prohibit devising or intending to devise a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. The leading case interpreting the relevant language is *McNally v. United States,* — U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which reversed convictions of defendants charged with participating in a scheme to require Kentucky's insurance agency to share its commissions with companies in which defendants secretly had an interest. The *McNally* indictment alleged, in relevant part, (a) that the defendants had defrauded the state of the right to have its affairs conducted honestly, and (b) that by virtue of their fraud on Kentucky, the defendants received money from the insurance companies. There were no allegations that Kentucky paid higher premiums because of defendants' scheme. Judge Sand relied upon *McNally* in dismissing the federal fraud counts. The government argues that the

judge erred, but Evans responds that the Court in *McNally* reversed the convictions "because the only party wronged, the Commonwealth of Kentucky, did not lose money because of the scheme." We do not think matters are so clear. Although there is language in *McNally* that supports Evans, the opinion's holding is that the statutes apply only to "frauds involving money or property," and not to schemes relating to good government. 107 S.Ct. at 2881. This reading of the case is confirmed by the Supreme Court's description of *McNally* in *Carpenter v. United States*, 108 S.Ct. 316, 320 (1987) (citations omitted): "We held in *McNally* that the mail fraud statute does not reach 'schemes to defraud citizens of their intangible rights to honest and impartial government,' and that the statute is 'limited in scope to the protection of property rights.'" Thus, as we read *McNally*, the Supreme Court did not focus on whether the person deceived also had to lose money or property.

Nonetheless, this may be the correct view of the statute. If a scheme to defraud must involve the deceptive obtaining of property, the conclusion seems logical that the deceived party must lose some money or property. See *United States v. Covino*, 837 F.2d 65, 71 (2d Cir.1988) ("mail fraud requires a finding that the victim be defrauded of money or property."); *United States v. Starr*, 816 F.2d 94 (2d Cir.1987) (pre-*McNally*). Language in *McNally* supports this reading of the statutes. For example, the Court stated that "Insofar as the sparse legislative history reveals anything, it indicates that the original impetus behind the mail fraud statute was to protect the people from schemes to *deprive them* of their money or property," 107 S.Ct. at 2879 (emphasis added). Similarly, the Court distinguished 18 U.S.C. Section 371, which punishes a conspiracy to defraud the United States and which has been construed to encompass non-property rights, like the right to honest government, from the wire and mail fraud statutes by explaining that Section 371 protects many interests of the federal government, but that "any benefit which the Government derives from the [wire or mail fraud] stat-ute[s] must be limited to the Government's interests as property-holder." 107 S.Ct. at 2881 n. 8. This statement implies that for those statutes to apply, the government must lose property if the government is the defrauded party. Finally, the Court explained that "the words 'to defraud' *commonly* refer 'to wronging one in *his* property rights by dishonest methods or schemes.'" 107 S.Ct. at 2880–81 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)) (emphasis added). This statement tends to support Evans, although the word "commonly" implies that in some circumstances "defraud" could have other meanings. These quotations, although dicta with regard to the issue before us, indicate that the Supreme Court may have read the mail fraud statute as the district court did.

The government argues that the legislative history of the predecessors to the current statute reveals that Congress intended the statutes to forbid activities that would be permitted by this reading of the law. In particular, the government observes that Congress amended the law in 1889 specifically to prohibit schemes in which defendants mailed letters offering to sell counterfeit money at a fraction of face value. Sometimes defendants would defraud those who sent them money by not sending any counterfeit in return, and sometimes defendants would send the counterfeit and defraud the merchants to whom it was passed by depriving them of the value of the currency they thought they were getting. See Rakoff, The Federal Mail Fraud Statute (Part I), 18 Duquesne L. Rev. 771, 797–98 (1980). The government argues that the district court's interpretation of the law would prevent prosecution of defendants who actually sent the counterfeit, since the defendants defrauded the merchants who accepted the counterfeit currency but received money from those to whom they had sold the counterfeit. However, this objection is easily answered. The point is not that the defendant must receive the same money or property that the deceived party lost, but only that the

party deceived must lose money or property. Since defendants who sent the counterfeit currency would be deceiving the merchants and since the merchants would lose money from the scheme, such defendants could be convicted even under this interpretation of this law.

However, the case before us today does not require us to decide this general question. As already quoted, the Supreme Court has made clear that "any benefit which the Government derives from the [wire or mail fraud] statute[s] must be limited to the Government's interest as property-holder." *McNally*, 107 S.Ct. at 2881 n. 8. This is enough for this case. To win, the government must show that it had some property interest in the arms. This it has not done. The closest it comes is when it half-heartedly argues that the indictment implies that the United States owned all of the rights in at least some of the weapons at some point, since certain types of weapons legally may be sold only by the government. However, the government also stated at oral argument that it would not attempt to prove its ownership at trial. Consequently, for present purposes we assume that the government is not asserting any property right arising out of sales of weapons owned and possessed by the United States immediately before the fraud, but only rights arising out of sales of weapons owned by third countries. Thus, unless we accept the alienation theory, the judgment below should be affirmed under the interpretation of the federal fraud statutes previously set out.

Defendants assert that we may not consider the alienation theory because it is not raised in the indictment; were we to consider it, they argue, we would violate their fifth-amendment right to a grand jury indictment. We do not decide this issue because, even assuming that the indictment alleges that defendants schemed to deprive the United States of the right to control alienation of the weapons, we find that such a right is not "money or property" under *McNally*.

### III. The Alienation Theory

According to the government, "[t]he right at issue here is the right of the United States Government to prevent the resale or retransfer of U.S. military weaponry from foreign nations to other, unacceptable foreign powers." The government claims that this right "constitutes an interest in, and a right to exercise control over, property." The government's argument in favor of this alienation theory has three steps. First, the government says that *McNally* requires that we interpret "property" broadly. Next, it urges that "property" is defined by the common law, and, finally, it claims that the common law recognizes as a property right a non-possessor's interest in the alienation of an object.

Although we do not necessarily disagree that "property" is to be interpreted broadly, we note that the government's citation to *McNally* does not support the government's position. Citing *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), the Court said that "the phrase 'any scheme or artifice to defraud' is to be interpreted broadly insofar as property rights are concerned." This quotation means that once a property right is found, any attempt to take the right by trickery is punishable, but it implies nothing about when to find a property right. This interpretation is bolstered by McNally's discussion of *Durland*, which held that the mail-fraud statute reached schemes to take property not only by common-law "false pretense" but also by any other means that a defendant might develop. Thus, we think that the Supreme Court has not directed us to interpret "property" more broadly than usual.

We agree with the government's second contention that common-law definitions can help elucidate the meaning of "property" under *McNally*, although we caution that definitions created for one purpose cannot always be transported into another. It is also undeniable that under some circumstances a right to control the future alienation and use of a thing is a property right. As the government points out, law students in real property class have tradition-

ally learned about the fee simple determinable, the fee simple subject to a condition subsequent, the possibility of reverter, and the power of termination, all of which are devices through which a nonpossessor controls land. Similarly, in *Carpenter* the Supreme Court held that the Wall Street Journal's interest in the exclusive pre-publication use of the contents of its columns was a property right. 108 S.Ct. at 321 ("exclusivity is an important aspect of confidential business information and most private property for that matter.").

However, the fact that the common law recognizes some rights to control alienation as property does not mean that all such rights are property rights within the meaning of the federal fraud statutes. The analogy to the common law cuts both ways. In *Carpenter*, the court pointed out that the right in question there—exclusive use of confidential business information—was recognized in various contexts. 108 S.Ct. at 320. That the right at issue here has not been treated as a property right in other contexts, and that there are many basic differences between it and common-law property are relevant considerations in deciding whether the right is property under the federal fraud statutes.

One difference between the right asserted here and traditional real-property rights is that common-law real property estates usually provide that an estate holder will, under some circumstances, have the right to possess the land.[1] However, the United States will never have the right to possess the weapons involved in this case, even if a foreign government violates the resale restrictions. Instead, either the President or Congress may determine that a violation warrants restrictions on *future* sales of weapons to the violator. 22 U.S.C. § 2753(c)(1)–(4). The government concedes that the violations have no effect on the purchaser's title or on the seller's right to profits from the illegal sale. This elaborate, integrated scheme substitutes for the traditional property remedies of replevin, damages or specific performance, a substi-

tution that is further proof that the right is not property. Moreover, as this court has said in a different context: "When Congress has provided specific and elaborate enforcement provisions, and entrusted their use to particular parties, we will not lightly assume an unexpressed intent to create additional ones," like federal fraud prosecutions here. *Fox v. Reich & Tang, Inc.,* 692 F.2d 250, 255 (2d Cir.1982), aff'd sub nom. *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984). See also *Dowling v. United States,* 473 U.S. 207, 226, 105 S.Ct. 3127, 3138, 87 L.Ed.2d 152 (1985) (Congress should not be presumed to have adopted an indirect "blunderbuss solution to a problem treated with precision when considered directly."). We are particularly loath to expand the wire and mail fraud statutes further, since we have already "tolerated an extraordinary expansion" of these laws. *United States v. Weiss,* 752 F.2d 777, 791 (2d Cir.) (Newman, J., dissenting), cert. denied, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985).

The government responds that the nature of the remedy does not affect the characterization of the interest. It explains that the remedy is unusual because the offending party is often a foreign sovereign, and no judicial forum exists to enforce rights against foreign sovereigns. The government argues that "[t]he realities of international law and politics ... which prevent the United States from filing a replevin or damages action ... whenever a foreign country breaches its agreement not to resell arms ... hardly leads [sic] to the conclusion that the United States has no rights.... It simply explains why Congress enacted the retaliatory remedies." We do not disagree with the government's characterization of the problems Congress faced, and we do not enter the longstanding debate about the relationship between rights and remedies. However, the difficulty Congress faced highlights that the

---

1. We recognize that restrictive covenants may create non-possessory interests in land. However, as discussed in the text, the government does not allege that title to the weapons is encumbered by the alienation restrictions, and covenants are therefore distinguishable.

interest here is of a different character than run-of-the-mill property rights.

There are other important dissimilarities between the basic assumptions made by the common law of property and those made in the world of international arms sales. Property law disfavors restraints on alienation and dead-hand control by prior owners. In contrast, Congress has enacted elaborate laws to limit who may possess or sell weapons. Moreover, the usual rules of economics are not supposed to govern arms sales, which instead are regulated by foreign and human-rights policies in addition to supply and demand. Because the background for the rules governing arms sales differs so greatly from the background of common-law property, we are reluctant to engraft principles from one sphere to the other.

All of these distinctions suggest to us that the government's interest here is ancillary to a regulation, not to property. A law prohibiting a particular use of a commodity that the government does not use or possess ordinarily does not create a property right. If it did, many government regulations would create property rights. For example, laws preventing the sale of heroin or the dumping of toxic waste would create government property rights in the drugs or chemicals. Admittedly, the line between regulation and property is difficult to draw with scientific precision, see generally B. Ackerman, Private Property and the Constitution (1977), and we do not mean to imply that the government never has a property interest in the limits it imposes on property use.

In this criminal case, however, our evaluation of the differences between weapons and more usual property is colored by the rule of lenity, which the Supreme Court recently directed we consider when interpreting the statutes at issue here. In *McNally*, the Court explained that "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher one only when Congress has spoken in clear and definite language.... 'There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute.' " 107 S.Ct. at 2881 (citations omitted). Although the alienation theory is clever and appeals to a lawyer's sense of technical symmetry, absent more specific language in the statute it is not a solid enough theory on which to ground a criminal prosecution involving a highly-regulated and unusual field.

Because of the substantial differences between international arms sales and common-law property transactions, we conclude that the United States's interest in regulating foreign resales of arms is not a property right for wire and mail fraud purposes. In so doing, we do not fear that wrongdoing will go unpunished because the government can prosecute defendants under other existing laws, and indeed is doing so. In addition, if Congress feels that still more laws are necessary, it can enact them.

The judgment of the district court is affirmed.