UNITED STATES of America, Plaintiff,

v.

Jay L. TUROFF, Donald Sherman, and Ronald Sherman, Defendants.

No. CR–87–185.

United States District Court, E.D. New York.

Dec. 22, 1988.

Laurence A. Urgenson, Chief Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Edward Rappaport, New York City, for Jay L. Turoff.

Michael Rosen, New York City, for Donald Sherman.

Gerald L. Shargel, New York City, for Ronald Sherman.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Defendants have moved to dismiss the indictment in this case on the ground that, under the holding in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), it fails to allege a violation of the mail fraud statute, 18 U.S.C. § 1341.

For the reasons stated below, defendants' motion is denied.

FACTS

The superseding indictment in this case charges that, between September 1980 and March 1986, defendants conspired

> to use the mails and to cause the use of the mails for the purposes of executing a scheme and artifice:
>
> (a) to defraud the [Taxi and Limousine Commission ("TLC")] and the City of New York and to obtain by means of false and fraudulent pretenses, representations and promises *property of the TLC, namely 23 unauthorized taxi me-*

*dallions* in excess of the 100 Authorized Diesel Medallions (hereinafter "23 Unauthorized Taxi Medallions"); and

(b) to defraud the TLC, the City of New York and its citizens of *money and property lawfully due to the TLC, namely annual license renewal fees* on the 23 Unauthorized Taxi Medallions.

Superseding Indictment ["the indictment"], ¶ 12 (emphasis added).

According to the indictment, in late 1978, the TLC, which regulates the City's medallion taxicabs, authorized the issuance of 100 temporary taxi medallions to a corporation ("Research Cab Corporation") to be formed by defendant Donald Sherman. The purpose of the temporary medallions was to test the feasibility of diesel engines in New York City taxicabs.

The indictment alleges that in late 1980, the TLC's chairman, defendant Turoff, caused an additional 23 unauthorized medallions to be diverted to his codefendants and placed on gasoline- and diesel-powered taxicabs registered to Research Cab and to Tulip Cab Corporation. These taxicabs allegedly operated in the City from late 1980 to early 1985. Defendants Donald and Ronald Sherman allegedly deposited the proceeds from those taxicabs, which exceeded $500,000, in the bank account of a shell corporation ("Exdie Cab Corporation").

Allegedly, defendants never paid the TLC the annual license renewal fees for the unauthorized medallions. In connection with the conspiracy, the defendant Turoff allegedly gave false and misleading information to the TLC Commissioners and the Mayor's office, and destroyed TLC records on the Tulip Cab Corporation and all the defendants allegedly gave false and misleading information to the New York State Commission of Investigation. The indictment alleges fourteen instances in which the mails were used to effectuate the scheme.

## DISCUSSION

### I.

The mail fraud statute under which defendants have been indicted was first enacted in 1872. In its present form, it now reads:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Defendants move to dismiss the indictment on the ground that it does not state a cognizable violation of the mail fraud statute as interpreted in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally,* the Supreme Court reversed the mail fraud convictions of Charles J. McNally and James E. Gray on the ground that the mail fraud statute does not reach schemes which violate "the intangible right of the citizenry to good government." *Id.,* 107 S.Ct. at 2879. The case involved a scheme devised by Gray, who held two top government posts in the Kentucky state government, and Howard P. "Sonny" Hunt, a state Democratic party chairman who had been given *de facto* power by the governor to select the insurance agencies from which the state would buy its policies. Hunt selected a certain agency as the state's agent for securing a workmen's compensation policy, on the condition that that agency would share any resulting commissions in excess

984

of $50,000 a year with twenty-one other insurance agencies specified by Hunt. Among the designated agencies was one controlled by Hunt and Gray (who had formed it for the exclusive purpose of obtaining the excess commissions). McNally served as the agency's front man.

Gray and McNally were tried on one count of mail fraud[1]. The indictment alleged that the defendants had

devised a scheme (1) to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly, and (2) to obtain, directly and indirectly, money and other things of value by means of false pretenses and the concealment of material facts.

*Id.*, 107 S.Ct. at 2878.

The District Court instructed the jury it could convict McNally and Gray of mail fraud if it found that they had been part of a scheme through which the agency controlled by Hunt and Gray had received the excess commissions and either Hunt or Gray had failed "to disclose [his] interest [in the agency] to persons in state government whose actions or deliberations could have been affected by that disclosure." *Id.*, 107 S.Ct. at 2879. The jury convicted defendants, and the Court of Appeals affirmed the convictions, relying on many prior decisions holding that "the mail fraud statute proscribes schemes to defraud citizens of their intangible rights to honest and impartial government." *Id.*

The Supreme Court reversed, holding that "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government." *Id.* The Court framed the issue in the case narrowly:

The issue is thus whether a state officer violates the mail fraud statute if he chooses an insurance agent to provide insurance for the State but specifies that the agent must share its commissions with other named insurance agencies, in one of which the officer has an ownership interest and hence profits when his agency receives part of the commissions. We note that as the action comes to us, there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance. Hunt and Gray received part of the commissions but those commissions were not the Commonwealth's money. Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent. Indeed, the premium for insurance would have been paid to some agency, and what Hunt and Gray did was to assert control that the Commonwealth might not otherwise have made over the commissions paid by the insurance company to its agent.... We hold, therefore, that the jury instruction on the substantive mail fraud count permitted a conviction for conduct not within the reach of § 1341.

*Id.*, 107 S.Ct. at 2881–82 (footnote omitted).[2]

The Court also held that, absent a clearer indication from Congress[3], it could not find that the mail fraud statute had criminalized defendants' failure to disclose their interest

---

1. Defendants were also tried and convicted on one count of conspiracy to violate the mail fraud statute and to defraud the United States through the obstruction of federal tax collection. *Id.*, 107 S.Ct. at 2878.

2. The narrowness of *McNally's* holding was underscored in *Carpenter v. United States,* — U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), which held that a newspaper had a property right under § 1341 in the exclusive pre-publication use of confidential business information, and noted that *"McNally* did not limit the scope of

§ 1341 to tangible as distinguished from intangible property rights." *Id.,* 108 S.Ct. at 320.

3. Congress *has* given a clearer indication by adding a new section, 18 U.S.C. § 1346, included in the Anti–Drug Abuse Act of 1988 signed by the President on November 18, 1988. That section provides:

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

in the agency to persons in state government, in view of the fact that state law apparently did not prohibit such nondisclosure. *Id.,* 107 S.Ct. at 2882 n. 9.

■ Most significantly for this case, the Court in *McNally* held that, because the mail fraud statute "had its origin in the desire to protect individual property rights, ... any benefit which the Government derives from the [mail fraud] statute must be limited to the Government's interest as property-holder." *Id.,* 107 S.Ct. at 2881 n. 8. Accordingly, in the present case, the government's failure to demonstrate the City's interest "as property-holder" in the medallions would be fatal to that charge in the indictment that is based upon the fraudulent procurement of the medallions.

However, even if the court accepted this argument, the indictment would still stand insofar as it is based on the scheme to avoid payment of license renewal fees. Money is the most concrete and tangible of property. In *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), the Court stated: "In its dictionary definitions and in common usage 'property' comprehends anything of material value owned or possessed.... Money, of course, is a form of property." On this basis alone, defendant's motion to dismiss the indictment must be denied. *Id.* 442 U.S. at 338, 99 S.Ct. at 2330 (citation omitted).

■ As regards the medallions, the court concludes that the fraudulent misappropriation of them deprived the City of a property interest cognizable under the mail fraud statute.

Defendants cite *United States v. Evans,* 844 F.2d 36 (2d Cir.1988) for the proposition that the City's interest in the medallions "is ancillary to a regulation, not to property." *Id.,* 844 F.2d at 42. *Evans* concerned a scheme to transfer arms regulated by the federal government from various foreign nations to Iran. The scheme required defendants to deceive the government about the true identity of the purchasing country in order to obtain the necessary approval for the transaction. The government's right to regulate such transfers arose either from a statutorily-required clause in the contract between the United States and the original foreign buyer, or by regulation. *Id.,* 844 F.2d at 38.

The Second Circuit, affirming the district court's dismissal of the mail and wire fraud counts against defendants, held that the government had not shown that it had some property interest in the arms. *Id.,* 844 F.2d at 40. Furthermore, the court rejected the government's contention that "the right of the United States Government to prevent the resale or retransfer of U.S. military weaponry from foreign nations to other, unacceptable foreign powers" constituted "an interest in, and a right to exercise control over, property" for purposes of the mail fraud statute. *Id.*

In addressing the latter argument, the court rejected the government's analogies to common law property rights. The court reasoned that, while a right to control the future alienation and use of a thing can be a traditional property right (*e.g.,* the fee simple determinable, the fee simple subject to a condition subsequent, the possibility of reverter, and the power of termination), that does not mean that every such right is cognizable under the mail and wire fraud statutes. *Id.,* 844 F.2d at 40–41.[4] Specifi-

---

**4.** I note that the possessory and future interests named are not intrinsically "devices through which a nonpossessor controls land" or "control[s] alienation." 844 F.2d at 41. The estates in land described are expressions of the extent of one's *present* interest in property measured in terms of time. The owner of a fee simple determinable has a present, possessory interest in property which will continue "until" or "so long as" a specified event does or does not occur. The possibility of reverter is the *present* interest one has in the future use and enjoyment of the property when the fee simple determinable ends. The owner of a fee simple subject to a condition subsequent has a *present* possessory interest in property "upon condition that" or "provided that" a specified event does or does not occur. The power of termination is the *present* interest one has in the future use and enjoyment of that property upon the exercise of his power to terminate the possessory estate. All the estates described are present property interests in the sense that they are all descendible, devisable and alienable. N.Y.Est.Powers & Trusts Law § 6–5.1 (McKinney 1967). That a person who acquired either of those estates in property by or through a scheme or artifice to

cally, the court noted that the government's right to control arms transfers between foreign powers would never permit the United States to possess the weapons in question, and had no effect on the purchaser's title to the arms or the seller's right to profits from the sale. Rather, the regulatory scheme governing such transfers "substitutes for the traditional property remedies of replevin, damages or specific performance, a substitution that is further proof that the right is not property." *Id.*, 844 F.2d at 41. Moreover, the court expressed its reluctance to apply common law property rules in the fundamentally different context of weapons transfers, which are governed by foreign policy and human rights considerations in addition to the usual economic laws of supply and demand. *Id.*, 844 F.2d at 42.

The court summed up by finding that the government's interest in the weapons was essentially regulatory:

All of these distinctions suggest to us that the government's interest here is ancillary to a regulation, not to property. A law prohibiting a particular use of a commodity that the government does not use or possess ordinarily does not create a property right. If it did, many government regulations would create property rights. For example, laws preventing the sale of heroin or the dumping of toxic waste would create government property rights in the drugs or chemicals. Admittedly, the line between regulation and property is difficult to draw with scientific precision ... and we do not mean to imply that the government never has a property interest in the limits it imposes on property use.

*Id.*, 844 F.2d at 42 (citation omitted).

*Evans* is distinguishable. As discussed above, in *Evans* the United States had no possessory interest in the weapons, nor did the deception practiced by the defendants affect the purchaser's title to the weapons or the seller's right to profit from the sale of the weapons. Here, defendants are accused of *taking* 23 items of tangible personal property from the City's possession.

Title to those medallions in the hands of third persons would be affected. Citation of authority is not required for the principle that a thief cannot transfer title even to a bona fide purchaser for value. While the government in *Evans* had no possessory interest in the weapons, the TLC in this case did have a possessory interest in the medallions. It maintained them under lock and key at its offices. It had title to them. An action for conversion of those medallions would lie and either replevin or damages would be an available and appropriate remedy. Modern authority abounds. *See, e.g.*, 1 F. Harper & F. James, *The Law of Torts*, §§ 2.11 and 2.36 (1956); Prosser and Keaton, *The Law of Torts* 106 (5th ed. 1984); N.Y.Civ.Prac.L. & R. § 7103(a) (McKinney 1980). Given the impetus to return to the arcane learning of the law of property prompted by *McNally*, a quotation from *Book III of Blackstone's Commentaries on the Laws of England* (Lewis' Ed.1902) seems appropriate. At pages 145–46 that venerable author wrote:

The wrongful taking of goods being thus most clearly an injury, the next consideration is, what remedy the Law of England has given for it. And this is, in the first place, the restitution of the goods themselves so wrongfully taken, with damages for the loss sustained by such unjust invasion; which is effected by action of replevin; ...

That the medallions themselves are a valuable, marketable commodity was adverted to years ago by Professor Charles A. Reich in his seminal article entitled *The New Property*, 73 Yale L.J. 733 (1964). He wrote, at page 735:

A New York City taxi medallion, which costs very little when originally obtained from the city, can be sold for over twenty thousand dollars.

In a footnote at that point, the author observed:

7. A New York Taxi Medallion is a piece of tin worth 300 times its weight in gold. No new transferable medallions have been issued since 1937. Their value

defraud would acquire a present interest in

property is beyond cavil.

in 1961 was estimated at $21,000 to $23,000; *banks will lend up to $13,000 on one.* The cabbie pays the City only $200 a year for his medallion. There is a brisk trade in them: out of 11,800, about 600 changed hands in 1961. One company, National Transportation Co., sold 100 medallions at $21,000 each, a transaction totaling $2,100,000. A non-transferable license, of which there are a few, has no market value. N.Y. Times, Dec. 5, 1961, p. 46, col. 3.

 The government also contends that the medallion is, in essence, the equivalent of an easement to use the city streets. At the risk of dwelling too long on the esoterica of property, the medallions could not properly be equated with easements. An easement is generally appurtenant, which is to say that it is a right which the owner of one parcel of land (the dominant tenement) may exercise in or over the land of another (the servient tenement) for the benefit of the former. *See, e.g., Greenwood Lake & Port Jervis R.R. Co. v. New York & Greenwood Lake R.R. Co.,* 134 N.Y. 435, 31 N.E. 874 (1892). An easement in gross is a right created in a person to use the land of another, which the owner of that easement may enjoy even though he does not own or possess a dominant estate. Although the concept of an easement in gross has been recognized, such an easement is rare. *See, e.g., Mayor, etc. of City of New York v. Law,* 125 N.Y. 380, 26 N.E. 471 (1891). The government's contention would have been more technically correct had it characterized the medallion as a "special franchise" which confers a right to do something in the public highway which, except for the grant, would be a trespass. *See, e.g., City of New York v. Comtel Inc.,* 57 Misc.2d 585, 594 n. 3, 293 N.Y.S.2d 599, 607 n. 3 (Sup.Ct.N.Y.Co.), *aff'd,* 30 A.D.2d 1049, 294 N.Y.S.2d 981 (1st Dep't 1968), *aff'd,* 25 N.Y.2d 922, 304 N.Y.S.2d 853, 252 N.E.2d 285 (1969).

A franchise is property. It is assignable, taxable and transmissible. *Hatfield v. Straus,* 189 N.Y. 208, 219, 82 N.E. 172 (1907). A mere license, on the other hand, is nothing more than a personal, revocable privilege. *See, e.g., Brooklyn Heights R.R. Co. v. Steers,* 213 N.Y. 76, 79, 106 N.E. 919 (1914). It would not be seriously disputed that a taxicab "license" is, accurately speaking, a special franchise which is not revocable at will and may not be taken away except by due process. *Hecht v. Monaghan,* 307 N.Y. 461, 121 N.E.2d 421 (1954). *See also, Wignall v. Fletcher,* 303 N.Y. 435 (1952). The resolution of this motion will not be dependent, however, upon the technically correct characterization of the matter in issue as being either a franchise, license, or easement.

The government also contends that the physical medallions themselves are "property" for purposes of the mail fraud statute. The defendants ridicule that contention by deprecatingly referring to the medallions as nothing more than "23 pieces of tin". Thus, the defendants impliedly, but never explicitly, assert a *de minimis* qualification to the tort of conversion or the crime of larceny. No authority is cited to support that oblique assertion, nor is the court aware of any. In his dissenting opinion in *McNally,* Justice Stevens was prescient when he expressed doubt about the gravity of the ramifications of the Court's decision and said that "Congress can, of course, negate it by amending the statute." *Id.,* 107 S.Ct. at 2890. As has already been noted, Congress did exactly that. Justice Stevens went on, however, to observe that:

> Even without Congressional action, prosecutions of corrupt officials who use the mails to further their schemes may continue since it will frequently be possible to prove *some* loss of money or property.

*Id.* (emphasis added). In this respect Justice Stevens was also prescient. The medallion is a tangible, physical object. The Administrative Code of the City of New York § 19–502(h) provides as follows:

> "Medallion" means the metal plate issued by the commission for displaying the license number of a licensed taxicab on the outside of the vehicle.

By charging the defendants with obtaining by false and fraudulent representations and promises 23 unauthorized taxi medallions, (Indictment ¶ 22(a)), the government

is seeking to prosecute these defendants by attempting to prove they caused *some* loss of property as alleged.

In *Evans,* upon which the defendants so heavily rely, the defendants were charged with making false statements to United States agencies to obtain approval to export arms. Here, the defendants are accused of *taking* 23 items of tangible personal property (the metal plates) from the City of New York in which the City did have a possessory interest. This is not a case where it is alleged that the citizenry is merely deprived of the honest services of a public official. This is a case where the public official is accused of conspiring with others to misappropriate tangible personal property. To view this case otherwise would be to hold, in effect, that a City cashier who embezzled money merely deprived the City of her honest and faithful services to which the embezzled money is an inconsequential appurtenance. It could not be disputed that the cashier committed a fraud, and had she used the mails to further her scheme, she would have committed mail fraud. In *Carpenter v. United States,* —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) the Court wrote:

> The concept of "fraud" includes the act of embezzlement, which is " 'the fraudulent appropriation to one's own use of the money or *goods* entrusted to one's care by another.' "

. . . . .

*Id.,* 108 S.Ct. at 321 (citation omitted).

Whether the medallions are tangible property or not to support a charge of mail fraud may also be discerned by asking whether the wrongful taking of the medallions from the offices of the TLC would be larceny. Defendants advise that a state prosecution has been commenced on that ground. *See* N.Y. Penal Law § 155.00(1) (McKinney 1988), defining property for purpose of state larceny statute as "any article, substance or thing of value". Thus, the reluctance of the *McNally* Court to read the mail fraud statute as criminalizing conduct on the part of a state official which is not otherwise prohibited by state law, 107 S.Ct. at 2882 n. 9, need not deter here.

Given the views expressed to the effect that this indictment passes legal muster under *McNally,* discussion of *United States v. Murphy,* 836 F.2d 248 (6th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988) and of *United States v. Ferrara,* 701 F.Supp. 39 (E.D.N.Y.1988) *aff'd,* No. 88–1364, —— F.2d —— (2d Cir. Dec. 16, 1988) upon which the defendants rely is unnecessary. That these cases are deemed to be distinguishable for the reasons advanced should be apparent. The case which is closely analogous and not distinguishable from this is *United States v. Ianniello,* 677 F.Supp. 233 (S.D.N.Y.1988) in which the defendants were charged with a scheme to provide false information to the New York State Liquor Authority ("SLA") in order to obtain liquor licenses and defraud the state of tax payments by concealing the actual owners of the establishments licensed. The object of the scheme to defraud was to skim the profits from the operation of bars and restaurants. *McNally* was decided after they were convicted and they filed applications for habeas corpus relief contending that *McNally* made their mail fraud convictions unlawful. In denying their application and finding *McNally* readily distinguishable, Chief Judge Brieant held that:

> Contrary to petitioners' contention that the indictment merely alleged a scheme to deprive the SLA of intangible rights, the indictment only referred to the deprivation of intangible rights as incident to the scheme to defraud for pecuniary gain. The petitioners were alleged to have submitted falsified applications to the SLA that were intended to promote the larger scheme ... of concealing the real ownership interests of the establishments at issue in order to obtain liquor licenses to generate revenue from the sale of liquor and to facilitate the removal of cash from those businesses without detection by the authorities.

677 F.Supp. at 234–35.

Similarly, the indictment of these defendants alleges that they placed the 23 medal-

lions on taxis from which they derived substantial sums which were held and disbursed by a shell corporation (¶¶ 15–17).

Mindful that "an overspeaking judge is no well-tuned cymbal," I nevertheless make several additional observations.

The rule announced in *McNally* was that the mail fraud statute is applicable only to "frauds involving money or property" and not to schemes relating to good government. 107 S.Ct. at 2881. It logically followed, said the Court in *Evans*, 844 F.2d at 39, "that the deceived party must lose some money or property." *Carpenter* explained that *McNally* did not limit the scope of the mail fraud statute "to tangible as distinguished from intangible property rights." 108 S.Ct. at 320. From those pronouncements, the view has been expressed that obtaining from a sovereign by means of a fraudulent scheme utilizing the mails, a license to engage in a business, profession or occupation is not a violation of the mail fraud statute because the license, although property in the hands of the licensee is not property in the hands of the licensor. Upon reflection, the view is that A has nothing which, when he gives it to B, becomes something. This brings to mind L. Carroll, *Through the Looking Glass*, Ch. V (Modern Library Ed. at p. 200):

> ... the Queen remarked ... "I'm just one hundred and one, five months and a day."
>
> "I can't believe *that* " said Alice.
>
> "Can't you?" the Queens said in a pitying tone. "Try again; draw a long breath and shut your eyes."
>
> Alice laughed. "There's no use trying," she said: "one *ca'n't* believe impossible things."
>
> "I daresay you haven't had much practice," said the Queens. "When I was your age, I always did it for half-an-hour a day, why, sometimes I've believed as many as six impossible things before breakfast."

To view the sovereign's power to grant licenses, or franchises, or easements as being something other than money or property is to equate, erroneously in my view, the sovereign with an individual or corporation.

What the latter sells, buys, creates or manufactures and the proceeds derived from those activities is money or property in the traditional sense. The sovereign can buy and sell and manufacture and derive proceeds from those activities only by virtue of the power it possesses as sovereign— namely its police power, its power to tax, etc. It is only through the exercise of those powers that the sovereign obtains the revenues which enable it to function at all and acquire, if it chooses, "property" in the traditional sense. To rob the sovereign of the due exercise of that power by schemes or artifices to defraud, is to rob it of "property" as surely as the goods or chattels or money obtained from a private person by similar schemes or artifices.

The view of cases such as *Murphy* and *Ferrara, supra,* that licenses are only property in the hands of the licensee, but never in the hands of the government represents an inversion of historical fact. In the seminal article to which reference has already been made, which urged that various important government benefits (including licenses) be accorded a status akin to "property," Professor Charles Reich noted that traditionally, just the opposite was true—licenses, and all other forms of government largess were considered *government* property long before the property rights of the licensee or recipient were accorded legal recognition:

> The chief obstacle to the creation of private rights in [government] largess [*e.g.*, licenses, welfare benefits, services, contracts and franchises] has been the fact that *it is originally public property, comes from the state, and may be withheld completely.* But this need not be an obstacle. *Traditional property also comes from the state, and in much the same way.* Land, for example, traces back to grants from the sovereign. In the United States, some was the gift of the King of England, some that of the King of Spain. The sovereign extinguished Indian title by conquest, became the new owner, and then granted title to a private individual or group. Some land was the gift of the sovereign under laws

such as the Homestead and Preemption Acts. Many other natural resources—water, minerals and timber, passed into private ownership under similar grants. In America, land and resources all were originally government largess. In a less obvious sense, personal property also stems from government. Personal property is created by law; it owes its origin and continuance to laws supported by the people as a whole. These laws "give" the property to one who performs certain actions. Even the man who catches a wild animal "owns" the animal only as a gift from the sovereign, having fulfilled the terms of an offer to transfer ownership.

Reich, *The New Property*, 73 Yale L.J. 733, 778 (1964) (footnotes omitted; emphasis added).

The salutary fact that, in modern times, courts have recognized the property rights of licensees [5] need not blind us to the equally compelling fact that licenses, like other forms of public largess, originate in the state and are "public property," in the first instance.

The defendants' reliance upon *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) and *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), each involving § 4 of the Clayton Act, for the proposition that the government must sustain an injury in its commercial, proprietary capacity rather than in its sovereign capacity is not persuasive. *Hawaii* decided that § 4 of the Clayton Act does not authorize the State of Hawaii to sue as *parens patriae* for an injury to its general economy for fear of opening the doors to duplicative recoveries which every citizen of the state may obtain for damage to business or property occasioned by violation of the antitrust laws. *Reiter* did not involve a claimed injury by a sovereign, but the Court had

occasion to elaborate upon its holding in *Hawaii*. *See Reiter*, 442 U.S. at 342–43, 99 S.Ct. at 2332–33. *Reiter* is, however, of more than passing interest in another regard. The mail fraud statute (§ 1341), it will be recalled, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, *or* for obtaining money or property by means of false or fraudulent pretenses ... (emphasis added)

*McNally* held that a scheme or artifice to defraud does not violate the statute unless its purpose is to defraud someone of money or property, thus negating the use of the disjunctive in the statute. In *Reiter*, the Court said, 442 U.S. at 339, 99 S.Ct. at 2331:

> In construing a statute we are obliged to give effect, if possible, to every word Congress used.... Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise....

*See* Justice Stevens' dissent in *McNally*, 107 S.Ct. at 2884, questioning the Court's construction of § 1341 which ignores the canons of construction previously recognized as controlling.

The government has asked the court to regard *McNally* as limited to its precise facts in light of a recent amendment to the mail fraud statute which was intended to overrule *McNally*'s holding that the intangible right to honest government services is not "property" under § 1341. *See* 18 U.S.C. § 1346 ("For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."). For two reasons, the court need not address this argument. First, the indictment in this case involves a scheme to defraud the City of taxi medallions and license renewal fees, not a

---

5. *See, e.g., Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license); *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (same); *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (same); *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (license to

practice optometry); *Willner v. Committee on Character and Fitness,* 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963) (license to practice law); *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (horse trainers' harness racing license).

scheme to deprive the City of the intangible right of honest services. Second, the court finds that the indictment satisfies *McNally*'s holding that any benefit to the government under the mail fraud statute is limited to its interest as "property-holder." Thus, the indictment stands, whether or not *McNally* is limited to its precise facts.

For the reasons stated above, defendants' motion to dismiss the indictment is denied.

## II.

■ The defendants also seek dismissal of the indictment for the reason that, they contend, the mailings were incident to and not for the purpose of executing the alleged scheme to defraud. The mailings, they contend, were not integral or closely connected to the fraudulent scheme but were, instead, remote, tangential, collateral or incidental to the mail fraud scheme alleged.

The cases in which this issue has been previously addressed by other federal courts were thoroughly briefed and discussed by both sides. Suffice it to say that the indictment alleges that the mailings charged in counts two through fourteen were made "for the purpose of executing the aforesaid scheme and artifice and attempting to do so." Despite the defendants' protest that the mailings specified cannot be regarded as furthering the scheme and artifice, that conclusion is not compelled by a reading of the indictment in its entirety. The jury will be instructed on the elements of mail fraud the government must prove beyond a reasonable doubt and it will be for the jury to determine whether those mailings were for the purpose of executing the scheme to defraud or were entirely incidental to it.

## III.

■ The defendants have sought an order of the court which would compel the government to provide a witness list prior to trial. An analysis of the reasons advanced by the defendants for the issuance of such order fails to reveal a specific showing of particularized need for such a list in the preparation of their defense. The allegations in this indictment have been the subject of investigation by the New York State Investigation Commission and the Grand Jury for some time. The mailings enumerated in counts two through fourteen, the records referred to in the indictment, and the testimony the defendants gave before the State Investigation Commission are or should be well known to them. Absent the requisite showing of need, the motion for such a list is denied.

## IV.

■ The defendants have sought an order which would compel the government to provide a bill of particulars with respect to paragraphs 18 and 19 of the indictment which allege that they attempted to conceal the conspiracy by giving false testimony to the State Commission of Investigation (¶ 18) and that Turoff gave false information to the Mayor of the City of New York and to the Taxi and Limousine Commission.

Rule 7(f) of the Fed.R.Crim.P. leaves such a request to the discretion of the court. That discretion should be exercised in favor of the movant when a bill of particulars is necessary to inform the defendant with sufficient precision of the charges against him to enable him to prepare his defense, avoid unfair surprise at trial, and assert the prohibition against being twice put in jeopardy for the same offense. No such necessity is apparent from a reading of this indictment which clearly informs the defendants of the charges against them. This aspect of the motion is denied.

## V.

■ The defendants request an order compelling the production of statements of co-conspirators that the government intends to introduce at trial as admissions of the defendants under Rule 801(d)(2) Fed.R. Evid. The defendants base the request upon Rule 16(a)(1)(A) of the Fed.R.Crim.P. which provides in substance that the government shall permit the defendant to inspect and copy or photograph any relevant written or recorded statements made by the defendant of which the government

knows or should know and within its possession or control; the substance of any oral statement of the defendant in response to interrogation by a person known to the defendant to be a government agent and which the government intends to offer in evidence; and recorded testimony of a defendant before a grand jury which relates to the indictment.

The government does not dispute the defendants' assertion of entitlement to pretrial disclosure of coconspirators' statements on the ground that such statements are defendants' statements under Fed.R. Crim.P. 16(a)(1)(A) or by attribution under Fed.R.Evid. 801(d)(2). The government is, therefore, hereby directed to disclose all statements made during the course of and in furtherance of the conspiracy by a coconspirator who is not also a government witness as would be required by Rule 16(a)(1)(A) if the statement were that of a defendant.

## VI.

The defendants Donald and Ronald Sherman have moved pursuant to Fed.R.Crim. P. 12 for an order suppressing evidence obtained from the execution of search warrants for the Midland Service Corporation and Research Cab Corporation premises. The motion to suppress is predicated upon the assertions that the warrants were overbroad; there was an absence of probable cause to issue them; the reliance upon the facial text of the warrant was unreasonable.

*The Facts*

The facts leading up to the issuance of and the execution of the search warrants have been stated in an affidavit of Anthony Valenti, a criminal investigator for the United States Attorney's Office. Those facts are not in dispute and are as follows:

On March 13, 1986, Mr. Valenti was informed by the United States Attorney that the New York State Investigation Commission ("SIC") had that day referred a matter for possible federal prosecution involving fraud and corruption at the New York City Taxi and Limousine Commission ("TLC").

The following day, March 14, 1986, Investigator Valenti met with SIC officials who briefed him on that portion of the SIC's investigation that related to the issuance by the TLC of 100 taxi medallions to Research Cab Corporation in connection with an experimental program intended to test the feasibility of diesel engines in taxicabs (hereinafter referred to as the "Diesel Medallion Program"). Investigator Valenti was informed that the SIC had uncovered certain evidence that in addition to the 100 experimental medallions an extra 23 medallions had been fraudulently obtained and used by Research and Tulip Cab Corporations, both of which were operated and managed by Midland Service Corp., whose principals included Donald Sherman. In the briefing, the SIC officials also informed investigator Valenti of a burglary that had occurred at the TLC office on or about March 6, 1986, in which 23 of the medallions that had been used by Research Cab were reported stolen and that on March 7, 1986, Jay Turoff, then Chairman of the TLC, mysteriously recovered 18 of those "stolen" medallions in a wastebasket in the TLC offices.

In the late afternoon of March 14, 1986, Investigator Valenti received information from an SIC investigator that yet another suspicious break-in had occurred the night before at a TLC facility in Queens and that records relating to Research Cab apparently had been taken.

Faced with the possibility that critical evidence relevant to fraud and corruption in connection with the Diesel Medallion Program was being systematically destroyed by persons who feared discovery of their criminal activities, Investigator Valenti contacted Assistant U.S. Attorney Reena Raggi, who was then the Chief of Special Prosecutions in the United States Attorney's Office and who had been assigned to the TLC investigation. At approximately 5:30 P.M. on the evening of March 14, 1986, Valenti and AUSA Raggi began preparing an application for search warrants for the respective premises of Research Cab, Tulip Cab and Midland Service Corporation.

At approximately 9:00 P.M., AUSA Raggi and Investigator Valenti contacted Chief United States Magistrate A. Simon Chrein by telephone to apply orally for the warrants. After ascertaining the nature of the call, Chief Magistrate Chrein made arrangements to tape the conversation and placed both Investigator Valenti and AUSA Raggi under oath. The AUSA informed the magistrate that a nighttime warrant was urgently needed as a result of the two break-ins that had occurred within the last week. These break-ins, the AUSA continued, provided "reason to think that someone is interested in either stealing or destroying evidence pertinent to this investigation."

Investigator Valenti provided the magistrate with the basis for probable cause. The investigator stated that in 1978, the TLC had issued 100 medallions to Research Cab for use in the Diesel Medallion Program. A subsequent audit by the New York City Comptroller's Office revealed, however, that in fact 23 additional unauthorized medallions had been obtained and used by Research. Moreover, despite the fact that a final report rejecting the use of diesel engines had been issued in early 1985, by the end of 1985, only 58 of the 123 diesel medallions had been surrendered to the TLC and as of March 14, 1986, some 25 of the medallions were still missing. Investigator Valenti further recounted the two break-ins that had occurred and Turoff's purported recovery of 18 of the "stolen" medallions in a waste paper basket. Finally, Investigator Valenti averred that examination of the wide range of books and records sought was necessary for a "full and complete investigation into possible fraudulent issuance of taxi medallions to Research Cab Corporation".

Thereafter, Chief Magistrate Chrein questioned AUSA Raggi about the documents sought by the warrants:

MC: Ah, I take it the specific records you hope to find in the subject premises are, are the duplicates of the publicly main, ah stored records that are maintained by the target cab company.

RR: No, Your Honor, that's not quite true. What we're trying to find at this point are all of the records, all of the business records.

MC: Yes, but they're in the custody of the target companies.

After further colloquy between Chief Magistrate Chrein and AUSA Raggi relating to the burglaries and the need for a nighttime search warrant, the magistrate determined to issue the search warrants stating:

No, no, I just want, I am gonna authorize the entries and I'm gonna authorize the night time entries....

\*　　\*　　\*　　\*　　\*　　\*

I'm satisfied that, ah, I can issue the warrant ah, and, and ah, and it can be a night time warrant, ah, the record should reflect that I've authorized the warrant at 9:36 P.M. ...

Although the government had not requested that any statutory section of the criminal code be contained in the warrants' proposed description of items to be seized, Chief Magistrate Chrein modified the description to include a reference to the mail fraud statute, 18 U.S.C. § 1341, and informed AUSA Raggi and Investigator Valenti of this change. This modification was then included in the description of items authorized to be seized on the original warrant that the magistrate was required to prepare under Rule 41(c)(2) of the Federal Rules of Criminal Procedure. This modification was not, however, made on the "duplicate original" warrant that was in the possession of AUSA Raggi and Investigator Valenti. As authorized by Chief Magistrate Chrein and contained in the original warrants, the description of the items to be seized read as follows:

Books, Records, Documents Correspondence, Memoranda, Invoices, Bills, Leases, Registrations, Medallions, Contracts, Logs, Trip Sheets, Payroll Records, Bank Records, and Writings of any kind relating to the ownership, operations and maintenance of Research Cab Corporation, Midland Service Corporation, Carriage Service Company and Tulip Cab

Corporation which constitute evidence of violation of 18 U.S.C. section 1341.

After receiving judicial authorization to conduct the searches, Investigator Valenti, another criminal investigator from the U.S. Attorney's Office and three investigators from the SIC, conducted the searches of the two premises. Investigator Valenti supervised both searches and participated in all decisions regarding whether particular items should be seized pursuant to the warrants. Valenti was present during the entirety of both searches. Prior to the start of the initial search of the Midland/Tulip premises, but after investigators had entered the premises, Donald Sherman was apprised of the scope and nature of the searches to be conducted. Specifically, Investigator Valenti spoke by telephone with Donald Sherman and informed Sherman, in general terms, that the warrants involved the Diesel Medallion Program and the experimental medallions issued to Research Cab. Investigator Valenti also agreed to delay the search until Donald Sherman could arrive from his home, but Sherman did not thereafter come to the premiss being searched. Investigator Valenti subsequently spoke to counsel for Sherman and provided counsel with basically the same information he had earlier provided to Donald Sherman.

The searches were conducted and very few items were actually seized. The following items of evidence were seized from the Midland/Tulip premises:

1. a binder containing listings of vehicles and medallion numbers in the Midland fleet, including Tulip Cab and Research Cab;

2. a binder containing information relating to inspection stickers for taxicabs in the Midland fleet, including Research Cab and Tulip Cab;

3. folders marked "Research" and "Lost Rate Cards";

4. a box containing numerous "TLC" rate cards for taxicabs of Research Cab and Tulip Cab;

5. the general ledgers for Midland for the years 1981 through early 1986;

6. two midland check stub books;

7. various roof lights bearing medallion numbers of taxicabs used by Research Cab and Tulip Cab;

8. a stack of New York City motor vehicle tax returns, including some for Research Cab and Tulip Cab;

9. a notebook reporting the occurrence of taxicab accidents, including numerous accidents involving Research Cab and Tulip Cab; and

10. a rolodex card listing the names and telephone numbers of various TLC personnel.

The following items were seized from the Research Cab premises:

1. one folder containing information relating to the "retro-fitting" of Research Cabs with diesel engines;

2. one folder containing documents relating to Volvos used by Research Cab;

3. one envelope marked "Research";

4. a pad containing information relating to repairs of Research taxicabs;

5. roof lights reflecting medallion numbers for Research cabs;

6. various business cards; and

7. a lobby sign containing information relating to rates for leasing of Research taxicabs.

Before leaving each premiss, Investigator Valenti left behind a copy of the "duplicate original" warrant and an inventory of the seized items.

## A. *Overbreadth*

■ At the outset it should be noted that the warrants issued by Chief Magistrate Chrein at 9:30 P.M. on March 14, 1986 specifically authorize the seizure of the items enumerated from the premises described "which constitute evidence of violation of 18 USC section 1341." Those warrants also recite that the grounds for their issuance were communicated orally in an electronically recorded statement which will be transcribed, certified as accurate and attached when the warrants are returned. An examination of those warrants together with the statements upon which

they were based support the conclusion that the requirement of the Fourth Amendment that the place to be searched and the things to be seized be particularly described has been satisfied.

The sworn oral statement of Mr. Valenti to Chief Magistrate Chrein was so detailed and so complete as to leave no doubt regarding the purpose for which the search warrant was sought, and the nature of the documents which would be the objects of the search. That sworn application was, as has been indicated, explicitly incorporated by reference. *United States v. Weinstein,* 762 F.2d 1522 (11th Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986).

### B. *Probable Cause*

 The contention that the magistrate lacked probable cause may be quickly disposed of when the test for making a probable cause determination is applied to the sworn information presented to him. In *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (19832) the Court stated:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for … conclud[ing]" that probable cause existed. *Jones v. United States,* 362 U.S., [257] at 271 [80 S.Ct. 725 at 736, 4 L.Ed.2d 697 (1960)].

Bearing in mind not only the facts presented to the magistrate but that they were presented by an Assistant United States Attorney who was then the Chief of Special Prosecutions and a criminal investigator with years of experience, there was more than ample basis for concluding that probable cause existed.

### C. *Reliance Upon the Warrant as Issued*

The defendants' contention that Investigator Valenti unreasonably relied upon the warrant as issued and that *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) therefore is inapplicable, has no merit.

Because I have concluded that the warrant was issued with probable cause and was not overbroad, a discussion of this contention may be superfluous. *Leon* created a good faith exception to the Fourth Amendment exclusionary rule, by holding that the rule was not applicable to a search conducted pursuant to a technically defective warrant where the officer reasonably believed that the search was authorized by a valid warrant. Assuming that I were to hold that the warrant was not sufficiently particularized and that the Chief Magistrate erroneously believed there was probable cause to issue it, I would readily find that *Leon* was applicable.

A reading of *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed. 2d 737 (1984) decided on the same day as *Leon,* and *United States v. Buck,* 813 F.2d 588 (2d Cir.1987) furnishes the touchstones that are significant in determining whether good faith reliance was present. In *Sheppard,* the Court found that (1) the officers took every step that could reasonably be expected of them; (2) the officer prepared an affidavit which was reviewed and approved by the prosecuting attorney; (3) that affidavit was presented to a neutral judge; and (4) the judge concluded that the affidavit established probable cause. 468 U.S. at 989, 104 S.Ct. at 3428. In *Buck,* the court found that (1) the sworn statement (oral affidavit) made to the neutral magistrate was tape recorded to assure accuracy; (2) the crime was outlined for the magistrate; and (3) the officers described the evidence that led them to the premises searched. 813 F.2d at 592–93. Here, the magistrate was informed of burglaries which provided the urgency for a nighttime search. Every one of the factors to be gleaned from these cases as being significant, was present here. To accept the contention of the defendants would re-

quire a ruling that Investigator Valenti was required to disbelieve Chief Magistrate Chrein, who advised him that the warrant would issue and that he was authorized to conduct the search he requested. *Sheppard*, 468 U.S. at 989–90, 104 S.Ct. at 3428. The Court in *Buck* was faithful to that teaching in *Sheppard* in holding that the deterrent function of the exclusionary rule would not be served by penalizing the officer who relies upon the "objectively reasonable legal conclusions of an issuing judge." 813 F.2d at 593. It should be added here that the officer would also be penalized for relying upon the supervising Assistant United States Attorney.

For the foregoing reasons the motion to suppress is denied.

SO ORDERED.