MEMORANDUM
 

 VANASKIE, Chief Judge.
 

 The basis for this conspiracy to commit mail fraud and mail fraud prosecution is the alleged willful under-reporting to governmental agencies of municipal waste received by Empire Sanitary Landfill, Inc. (“Empire”) over a period of about seven years. The indictment charges that defendants Renato P. Mariani (Empire’s President), Michael L. Serafini (Empire’s Assistant Secretary), Leo R. Del Serra (Empire’s Comptroller), and Alan W. Stephens (Empire’s Operations Manager) conspired to cause to be sent to the Pennsylvania Department of Environmental Protection (“DEP”) and various local governments reports that deliberately omitted waste tonnage accepted at Empire that exceeded maximum daily limits established by the landfill permit issued to Empire by DEP. The indictment points out that various statutory fees payable to governmental units and royalty payments to a partnership known as FMKF Company (“FMKF”) were calculated on the basis of the fraudulent reports submitted by Empire. The indictment further alleges that “[i]n order to deter violations of the maximum daily volumes of solid waste set forth in landfill permits, state law requires DEP to impose a mandatory civil penalty of at least $100 per ton for each ton of solid waste received at any landfill in excess of the maximum daily volume limitations set forth in its permit.” (Indictment, ¶ 8.) The indictment asserts that the scheme to defraud was devised for the purpose of obtaining “money and property.”
 
 (Id.,
 
 ¶ 13.)
 

 Observing that the mail fraud statute is limited to deprivation of money or property, defendants argue that the mail fraud statute does not apply where, as here, the object, of the scheme to defraud is to avoid assessment of a civil penalty because the Commonwealth’s interest in such a penalty is that of a “regulator,” not that of a “property holder.” Contending that the $100 per ton penalty constitutes more than 95 percent of the alleged financial loss effected by the purported scheme to defraud, defendants have moved to dismiss the indictment. Defendants have moved alternatively for bills of particular and to compel discovery.
 

 The government has responded to the motion to dismiss by contending that (a) the state’s interest in the $100 per ton penalty is that of “property holder” under the mail fraud statute; (b) statutorily required fees and the FMKF royalty constitute cognizable property interests sufficient to support the indictment even if it is determined that the Commonwealth’s interest in the $100 per ton penalty is regulatory in nature and not proprietary; and (c) there are non-monetary property interests that the indictment fairly charges as objects of the scheme to defraud. The government also contends that there is no
 
 *577
 
 need for a bill of particulars and that it has complied with its discovery obligations under the Federal Rules of Criminal Procedure and this Court’s Pretrial Order.
 

 Having carefully considered the matter, I find that the statutory fees and FMKF royalty fall within the mail fraud statute’s terms “money and property” because Empire’s obligation to pay the fees and royalty accrued upon receipt of the municipal waste. As to the $100 per ton penalty, however, the government has not shown that Empire incurred a binding obligation to pay the penalty when it accepted waste in excess of its daily tonnage limits. Nor has the government shown that Pennsylvania’s interest in the civil enforcement mechanism is that of a “property holder.” Thus, impairment of the assessment of a civil penalty does not effect a loss cognizable under the mail fraud statute. Finally, I find that the “non-monetary” property interests advanced by the government in opposition to the motion to dismiss — the landfill permit issued by DEP to Empire, the information contained in the reports made by Empire to DEP, and Lackawanna County’s interest in scarce landfill space— are not fairly charged in the indictment as objects of the scheme to defraud. Accordingly, those non-monetary property interests may not be advanced by the government as alleged objects of the scheme to defraud.
 

 Because the indictment does identify losses of money and property,
 
 ie.,
 
 the statutory fees and FMKF royalty, as specific objects of the scheme to defraud, the motion to dismiss the indictment must be denied.
 
 See United States v. Asher,
 
 854 F.2d 1483, 1494 (3d Cir.1988),
 
 cert. denied,
 
 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989). Moreover, because defendants have generally not demonstrated a need for supplementation of the indictment, their motions for bills of particular will be denied, with the exception that the government will be required to identify unnamed co-conspirators and others who were involved in the alleged scheme to defraud. Finally, defendants’ motion for discovery, which presents,
 
 inter alia,
 
 the question of whether the government must search DEP files for
 
 Brady
 
 and other discoverable material, will be denied.
 

 I. BACKGROUND
 

 On December 15, 1998, a federal grand jury in this District returned a 25-count indictment against the four defendants. (Dkt. Entry 1.) The first count charges a conspiracy under 18 U.S.C. § 371.
 
 (Id.
 
 at 6-15.) Counts 2 through 25 charge violations of the federal mail fraud statute codified at 18 U.S.C. § 1341.
 
 (Id,
 
 at 16-22.)
 

 The factual context for the indictment is the complex of state laws and regulations governing the operation of municipal waste landfills in Pennsylvania. As alleged in the indictment, permits issued by DEP set the maximum amount of waste that may be accepted at a landfill on a daily basis.
 
 (Id.,
 
 ¶ 7.) Section 1112(f) of Pennsylvania’s Municipal Waste Planning, Recycling and Waste Reduction Act, 53 P.S. § 4000.1112(f), provides that “[i]n addition to any other remedies provided at law or in equity, [DEP] shall assess a civil penalty of at least $100 per ton for each ton of waste received at any municipal waste landfill in excess of the maximum or average daily volume limitations set forth in its permit.” As alleged in the indictment, Pennsylvania law also imposes various fees on landfills based on the amount of solid waste accepted by the landfill. (Indictment, ¶ 10.) These fees include a $2.00 per ton recycling fee that is used to fund Pennsylvania’s recycling program; a $1.00 per ton host municipality benefit fee payable to the municipality where the landfill is located; and a $.25 per ton fee payable to a county-established trust fund.
 
 (Id.)
 
 The indictment further alleges that in addition to the statutory fees set forth in paragraph 10 of the indictment, “Empire was obligated to pay LFMKF] a $1.50 royalty for each ton of solid waste disposed of at the landfill.”
 
 (Id.,
 
 ¶ 11.)
 

 
 *578
 
 According to the indictment, “[i]n order to monitor compliance with DEP regulations regarding waste volumes, waste origin, and waste content, as well as to insure that landfill operators pay the various fees required of them,” landfill operators are required to maintain daily records of solid waste deliveries and to submit on a quarterly basis (1) a “municipal waste landfill and resource recovery quarterly operations and fee report,” used,
 
 inter alia,
 
 to calculate the $2.00 per ton recycling fund fee; (2) a “host municipality benefit fee report,” used,
 
 inter alia,
 
 to calculate the $1.00 per ton host municipality fee; and (3) a “municipal waste landfill Act 101 (1988) 1108 site-specific post-closure trust payment worksheet,” used to calculate the $.25 per ton fee payable to the county-administered trust fund.
 
 (Id.,
 
 ¶ 12.)
 

 The indictment is based on defendants’ alleged scheme to accept waste in excess of the daily limits set forth in the solid waste disposal permit issued by DEP to Empire. Specifically, the indictment alleges that between 1989 and January 22, 1997, defendants “authorized and directed Empire employees to accept thousands of tons of solid waste at the landfill in excess of (1) what was reported to DEP, the host-municipalities, and other entities that received fees based upon the amount of waste received at the landfill, and (2) Empire’s permitted maximum daily volume.”
 
 (Id.
 
 ¶ 15.) Defendants concealed their scheme by essentially keeping two sets of books, with billing invoices being based on amounts of waste actually received, while the mandated reports to DEP and local governments indicated lesser amounts of waste.
 
 (Id.,
 
 ¶¶ 16-20.) The indictment charges specific mailings of the purportedly fraudulent reports from July 19, 1995 through January 21, 1997.
 
 (Id.,
 
 ¶¶ 23-39; Counts 2 through 25.)
 

 As alleged in paragraph 20 of the indictment, the statutorily-mandated reports “substantially underreported the amount of waste accepted at the landfill, as well as the recycling fee due DEP, ... the fees due to [the host municipalities]; ... [and] the fees due to the site-specific post-closure trust fund.... ” Because the reports that Empire submitted to DEP were used to calculate the fees it owed, defendants’ alleged mail fraud violations had the effect of depriving the state, municipal, county and private victims of fees and royalties. At oral argument, the government represented that Empire had accepted at least 74,000 tons of waste in excess of what it had reported over the time frame in question. (Tr. of Dec. 10, 1999 Oral Arg., Dkt. Entry 62, at 27.)
 

 The indictment does not specify the precise objects of the alleged scheme to defraud. Both the conspiracy and mail fraud counts, however, aver that the defendants devised the purported scheme for purposes of obtaining “money and property.” (Indictment, K13; Counts 2 through 25, K 2.) Specifically mentioned in the indictment, but not in the precise context of an object of the fraudulent scheme, is the alleged minimum $100 per ton penalty for acceptance of waste in excess of the daily limits specified in the operating permit. As noted above, the indictment also specifically alleges that defendants caused the submission of fraudulent reports that substantially understated fees payable to DEP, host municipalities, and the site-specific post-closure trust fund, -as well as the royalties due FMKF. Not mentioned at all in the indictment, but which the government maintains are necessarily subsumed within the indictment’s use of the terms “money and property,” is the Commonwealth’s interests in Empire’s operating permit and in the information Empire was required to report, as well as Lackawanna County’s interest in scarce landfill space.
 

 II. DISCUSSION
 

 A. “Money and Property” as Used in the Mail Fraud Statute
 

 Defendants contend that
 
 McNally v. United States,
 
 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and its progeny mandate the dismissal of the indictment
 
 *579
 
 because the government will not be able to “demonstrate that a cognizable ‘property’ interest is at the heart of’ defendants’ alleged scheme to defraud. (Brf. in Support of Mot. to Dismiss at 9.)
 
 [1]
 
 In
 
 McNally,
 
 the Court examined whether a mail fraud conviction could be based on a scheme to defraud the government of certain “ ‘intangible rights,’ such as the right to have the Commonwealth’s affairs conducted honestly.”
 
 McNally,
 
 483 U.S. at 352, 107 S.Ct. 2875. The
 
 McNally
 
 Court stated that “[rjather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the federal government in setting standards of disclosure and good government for local officials, we read § 1341 as limited in scope to the protection of property rights.”
 
 Id,,
 
 at 360, 107 S.Ct. 2875. In a footnote, the Court explained that “the mail fraud statute ... had its origin in the desire to protect individual property rights, and any benefit which the government derives from the statute must be limited to the Government’s interests
 
 as a property holder.” McNally,
 
 483 U.S. at 359 n. 8, 107 S.Ct. 2875 (emphasis added).
 

 Soon after rendering its decision in
 
 McNally,
 
 the Court had an opportunity to clarify what constitutes a property interest for purposes of the mail fraud statute. In
 
 Carpenter v. United States,
 
 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), petitioners were convicted of violating the mail fraud statute based upon a scheme in which R. Foster Winans, one of the authors of the Wall Street Journal’s daily “Heard on the Street” column, supplied information that was to appear in the column to stock brokers prior to the column’s publication.
 
 Id.
 
 at 23-24, 108 S.Ct. 316. Because the “Heard” column had an impact on the stock market, petitioners were able to make $690,000, over a four month period, by trading based upon the pre-
 
 *580
 
 publication information provided by Win-ans.
 
 Id.
 
 at 22-23, 108 S.Ct. 316. On appeal, petitioners argued “that their activities were not a scheme to defraud the Journal within the meaning of the mail and wire fraud statutes,” and that they did not obtain any “money or property” from the Journal, a necessary element of the mail fraud statute under the Court’s holding in
 
 McNally. Id.
 
 at 24, 108 S.Ct. 316. The
 
 Carpenter
 
 Court rejected petitioner’s contention, stating that
 
 “McNally
 
 did not limit the scope of § 1341 to tangible as distinguished from intangible property rights.”
 
 Id.
 
 at 25, 108 S.Ct. 316. Observing that “the object of the scheme was to take the Journal’s confidential information ...,” the Court concluded that “its intangible nature does not make it any less ‘property’ protected by the mail and wire fraud statute.”
 
 Id.
 
 After recognizing that “[confidential business information has long been recognized as property,” the Court stated that “it is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an' important aspect of confidential business information and most property for that matter.”
 
 Id.
 
 at 26-27, 108 S.Ct. 316. Accordingly, the Court held that “the conspiracy here to trade on the Journal’s confidential information is not outside the reach of the” mail fraud statute.
 
 Id.
 
 at 28, 108 S.Ct. 316.
 

 The parties agree that the structural holding of
 
 McNally
 
 survived the 1988 amendments to the mail fraud statute. (Brf. in Support of Mot. to Dismiss at 6; Response to Mot. to Dismiss at 5.)
 
 [2]
 
 Accordingly, in order to establish a violation of the mail fraud statute, the government will have to prove, among other things, that the defendants scheme sought to deprive another of money or property.
 

 Our Court of Appeals has interpreted the mail fraud statute in light of
 
 McNally
 
 and
 
 Carpenter,
 
 and offered its guidance as to what constitutes a property interest under that statute.
 
 See United States v. Asher,
 
 854 F.2d 1483 (3d Cir.),
 
 cert. denied,
 
 488 U.S. 1029, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989);
 
 United States v. Martinez,
 
 905 F.2d 709 (3d Cir.),
 
 cert. denied,
 
 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990);
 
 United States v. Henry,
 
 29 F.3d 112 (3d Cir.1994). These decisions inform the analysis of whether the governmental agencies’ interest in statutory penalties and fees is that of a “property holder.”
 

 In
 
 Martinez,
 
 the appellee was convicted under the mail fraud statute for his role in a fraudulent scheme to obtain a medical license from the Commonwealth of Pennsylvania.
 
 Martinez,
 
 905 F.2d at 710. Martinez argued, and the district court agreed, “that a ‘license is not property until issued and therefore a scheme to defraud the government of licenses is not covered by the mail fraud statute.’ ”
 
 Id.
 
 at 711. The Third Circuit declined to “make the esoteric distinction between an unissued and issued license,” and reversed the district court, holding that as to unissued medical licenses the Commonwealth was indeed a “property holder.”
 
 Id.
 
 at 714. In analyzing whether a medical license constitutes property under the mail fraud statute, our Court of Appeals analogized the Commonwealth’s loss of an unissued medical license to the Wall Street Journal’s loss of confidential information in
 
 Carpenter.
 
 The Third Circuit noted that in
 
 Carpenter,
 
 “the Journal did not lose any ‘thing’ — what it lost was the intangible right to keep to itself its information and the exclusive right to use it when and how it pleased.”
 
 Martinez,
 
 905 F.2d at 714. The court further recognized that although the loss suffered by the Commonwealth in
 
 Martinez
 
 —“the right to keep its medical licenses to itself and to bestow them on persons who had fairly earned them” — and the loss in
 
 Carpenter,
 
 were “different in character,” in each instance the scheme
 
 *581
 
 deprived the victim of “something of value."
 
 Id.
 
 at 714-15. Our Court of Appeals summarized its holding in
 
 Martinez
 
 as follows:
 

 [T]he government’s interest here is
 
 not simply that of a regulator,
 
 but rather that of the dispenser of valuable property in which the licensee has constitutionally protected property interests and which the government may enjoin upon misuse. We do not believe that Congress, in enacting the mail fraud statute, intended its reach to be dependent on artificial constructs and fleeting distinctions. Rather, the statute should be read as broadly protecting property interests, and we believe such a purpose is served in protecting the Commonwealth’s interests as the holder of valuable medical licenses from fraudulent conduct depriving it of such property.
 

 Id.
 
 at 714-15 (emphasis added).
 

 The Third Circuit has also stated that a district court may look to whether the law has traditionally recognized and enforced a particular interest as a property right when determining whether it is property for the purposes of the mail fraud statute.
 
 United States v. Henry,
 
 29 F.3d at 115. In
 
 United States v. Asher,
 
 the Third Circuit explained:
 

 Where rights are involved whose violation would lead to
 
 no
 
 concrete economic harm, and where those rights are the
 
 only
 
 rights involved in the case,
 
 McNally’s
 
 proscriptions would prevent upholding conviction on appeal. Where, on the other hand, a violation of the rights involved would result in depriving another of
 
 something of value,
 
 and the indictment, the proofs and the instructions are based on that fact, then the presence of intangible rights language will not prove fatal on appeal.
 

 [Tjhose cases that have sustained mail fraud convictions have done so where the “bottom line” of the scheme or artifice had
 
 the inevitable result of effecting monetary or 'property losses to the employer or to the state.
 
 This common thread appears
 
 despite references in the indictments, proofs, or instructions to violations of intangible rights
 

 United States v. Asher,
 
 854 F.2d at 1494 (emphasis added).
 

 In light of our Court of Appeals’ decisions in this area, it is thus clear that property interests are implicated where the defendants’ scheme deprives the victim, whether it be a private individual, an entity or the state, of something of value or where the scheme’s inevitable result is to effect a monetary or property loss. This conclusion, however, is tempered by the recognition in
 
 Martinez
 
 that when the state’s interest is “simply that of a regulator,” the fact that the scheme effects a monetary loss does not bring the matter within the mail fraud statute.
 

 B. The Sufficiency of the Property Interests Alleged in the Indictment.
 

 Defendants assert that the indictment in the instant case “describes a scheme involving largely the deprivation of governmental regulatory and enforcement interests but not property interests.” (Brf. in Support of Mot. to Dismiss at 1.) Defendants further argue that “government interests which are in the nature of general oversight, regulatory or enforcement power do not constitute property under the mail fraud statute.”
 
 (Id.
 
 at 15.) Based upon these premises, defendants conclude that the indictment is insufficient because it relies on interests which do not constitute money or property for purposes of the mail fraud statute.
 
 (Id.
 
 at 15-16.)
 

 1. The Pees Charged for Every Ton of Trash Accepted and the FMKF Royalty Payment.
 

 The government contends that the fees that Empire were required to pay for every ton of trash that entered the landfill constitute property for the purposes of the mail fraud statute. (Response to Mot. to Dismiss at 3, 5-6.) Specifically, the gov
 
 *582
 
 ernment asserts that the $2.00 per ton recycling fee, the $1.00 per ton host municipality benefit fee, the $.25 per ton fee to be paid to a county-specific, post-closure trust fund, and the $1.50 per ton royalty to FMKF constitute property under the mail fraud statute.
 
 [3]
 

 As stated in
 
 United States v. Turoff,
 
 701 F.Supp. 981, 985 (E.D.N.Y.1988), “Money is the most concrete and tangible of property.” The
 
 Turoff
 
 court quoted
 
 Reiter v. Sonotone Corp.,
 
 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), in which the Court explained that “[i]n its dictionary definitions and in common usage ‘property1 comprehends anything of material value owned or possessed.... Money, of course, is a form of property.”
 

 In the instant case, the above referenced fees were due for every ton of trash deposited at Empire. The obligation to pay and the 'concomitant right to collect accrued upon acceptance of the waste at the landfill. The fees and royalty payments are not discretionary and are designated for specific beneficiaries.
 
 [4]
 

 In
 
 United States v. Dray,
 
 901 F.2d 1132 (1st Cir.),
 
 cert. denied,
 
 498 U.S. 895, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990), the court had no difficulty in finding that a loss of building permit fees effected by a scheme to understate renovation costs was cognizable under the mail fraud statute. In language particularly apropos here, the court stated:
 

 In this case, the permit fee was no mere unilateral expectation, as appellant exhorts, but a legal obligation. Where such fees are required, conspiracies to avoid paying them deprive the sovereign of a very concrete and tangible Mnd of property — cash. We think it obvious that a governmental agency is deprived of “money or property” when persons attempt to evade, or divert, the payment of legally required fees and taxes. Other courts apparently agree.
 
 See, e.g., United States v. Gelb,
 
 881 F.2d 1155, 1162 (2d Cir.) (scheme to defraud Postal Service of revenue from mass mailings),
 
 cert. denied,
 
 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989);
 
 United States v. Doe,
 
 867 F.2d 986, 989 (7th Cir.1989) (scheme to defraud city of real estate taxes by granting assessment reductions);
 
 United States v. Turoff,
 
 701 F.Supp. 981, 985 (E.D.N.Y.1988) (scheme to avoid payment of license-renewal fees);
 
 United States v. Gill,
 
 673 F.Supp. 275, 281 (N.D.Ill.1987) (scheme to defraud county by diverting license fees). The permit fees lost by the City of Boston constituted a loss of “money or property” under section 1341 sufficient to bring appellant’s connivance within the statutory sweep.
 
 Id.
 
 at 1142.
 

 At oral argument, the government represented that Empire had accepted at least 74,000 tons of waste more than it had reported. (Tr. of Dec. 10, 1999 Oral Arg. at 27.) As a result of the failure to report this excess tonnage, fees and royalties were not paid by Empire. (Dkt. Entry 1 at 8.) The defendants’ alleged scheme to accept waste in excess of the limits set in Empire’s permit and not report the fact thus had the inevitable result of depriving the Commonwealth, local governments and FMKF of money to which they were enti-
 
 *583
 
 tied. Accordingly, the indictment reveals interests cognizable under the mail fraud statute that are plainly implicated by the alleged fraudulent scheme.
 

 2. The $100 per Ton Civil Penalty
 

 The premise for the government’s argument that the state is a “property holder” as to the civil penalty for accepting waste in excess of daily limits is that imposition of the penalty is mandatory. As support for this foundational argument, the government points to the language of 53 P.S. § 4000.1112(1), which, in pertinent part, states that “the [DEP]
 
 shall
 
 assess a civil penalty of at least $100 per ton for each ton of waste received at any municipal waste landfill in excess of the maximum or average daily volume limitations set forth in its permit.” (Emphasis added.) The government maintains that this language distinguishes the civil penalty at issue here from “[normal fines and penalties [which] are triggered by a finding of guilt and are part of a discretionary sentence that may or may not include a fine or financial penalty.]” (Response to Motion to Dismiss at 12.) Conceding that “[n]ormal fines and penalties ... may be too speculative to constitute a valid property interest,”
 
 id.,
 
 the government maintains that a
 
 mandatory
 
 civil penalty is not too speculative.
 

 Although § 1112(f) does appear to mandate a civil penalty of at least $100 per ton, it also provides that “[e]xcept for the minimum amount, the penalty shall be assessed and collected in the manner set forth in Section 1704.” Section 1704(a), in turn, provides, in pertinent part, that “|'i]n addition to proceeding under any other remedy available at law or in equity for a violation of any provision of this Act ... the [DEP]
 
 may
 
 assess a civil penalty upon a person for such violation.” 53 P.S. § 4000.1704(a) (emphasis added). This language suggests that DEP is vested with
 
 discretionary
 
 authority to seek imposition of civil penalties. Sections 1704(a) and 1112(f) can be reconciled by recognizing that DEP has discretionary authority as to whether to seek a civil penalty when a landfill exceeds its allowed daily volumes, but when it seeks to exercise such discretionary authority, it must assess a penalty of at least $100 per ton in excess of the allowed daily amount. Viewed in this light, the civil penalty at stake here is akin to the “normal fines and penalties” that the government concedes are too speculative to constitute a property interest under the mail fraud statute.
 

 The government has not shown that this interpretation of Sections 1112(f) and 1704(a) is erroneous. Nor has it proffered any evidence that DEP has established a policy of enforcing the $100 per ton minimum penalty whenever a landfill exceeds its daily volume limits.
 
 [5]
 
 Defendants assert that they have discovered evidence in DEP’s files of apparent violations of the daily maximum limits that have not resulted in penalty proceedings. Because the government has not substantiated that the civil penalty is mandatory, under the government’s own reasoning, the Commonwealth’s interest in the civil penalty is not that of a “property holder” as required by McNally.
 
 [6]
 

 
 *584
 
 Moreover, the civil penalty is plainly ancillary to the Commonwealth’s regulatory powers, held by the state not as property, but as an enforcement mechanism. As defendants observe, the penalty at issue here “is not calculated on the, basis of harm to or costs incurred by the Commonwealth, it does not go to fund any specific and environmental purpose or project, and is designed to impose a substantial cost on violators to convince operators not to violate their permits.” (Defendants’ Reply Brief at 5.) While an assessed penalty may ultimately yield an economic benefit to the Commonwealth, the primary purpose of the penalty is plainly regulatory. The penalty is set at a punitive level to deter violations of state law. The indictment itself acknowledges the regulatory purpose of the civil penalty by alleging that “[i]n order to
 
 deter
 
 violations of the maximum daily volumes of solid waste set forth in landfill permits, state law requires DEP to impose a mandatory civil penalty of at least $100 per ton.” (Indictment, If 8 (emphasis added.)) The government has not cited any case that holds that the state’s interest in a civil penalty is that of a “property holder” for purposes of mail fraud prosecutions. It has been held, however, that a power vested in the state as “an instrument of regulation” is outside the purview of the mail fraud statute.
 
 See United States v. Schwartz,
 
 924 F.2d 410, 416-17 (2d Cir.1991);
 
 United States v. Evans,
 
 844 F.2d 36, 42 (2d Cir.1988). At least prior to the time that a penalty is actually assessed, the state holds the punitive enforcement mechanism of a civil penalty in its arsenal of sovereign powers to enforce state law.
 
 [7]
 
 Because the Commonwealth does not possess the punitive enforcement mechanism of a civil penalty as a “property holder,” but holds it instead as a “regulator,” the government in this case cannot rely upon the $100 per ton minimum civil penalty as an intended “property” loss.
 
 [8]
 

 C. Alleged Property Interests Not Specifically Referred to in the Indictment
 

 The remaining alleged property interests asserted by the government — specifically, the Commonwealth’s interest in Empire’s permit, Lackawanna County’s interest in scarce and valuable landfill space, and the Commonwealth’s interest in the information contained in Empire’s reporting, forms — -are not referred to in the indictment in a manner that would provide the defendants with notice that they were objects of the alleged scheme to defraud.
 
 [9]
 
 As these interests are not pled in the indictment, the government will be pre-
 
 *585
 
 eluded from advancing them as objects of the scheme to defraud.
 

 Federal Rule of Criminal Procedure 7(c)(1) states, “|t]he indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.” Our Court of Appeals has explained that under this Rule, “[aln indictment is sufficient if it: 1) contains the elements of the offenses to be charged, 2) sufficiently apprises the defendant of what he must be prepared to meet, and 3) allows the defendant to show ... with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.”
 
 United States v. Rankin,
 
 870 F.2d 109, 112 (3d Cir.1989)
 
 (quoting Russell v. United Sixties,
 
 369 U.S. 749, 763-764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (internal quotations omitted)). The “functions of the indictment procedure are mandated by the Fifth and Sixth Amendments.”
 
 United States v. Telink, Inc.,
 
 702 F.Supp. 805, 806 (S.D.Cal.1988),
 
 aff'd,
 
 910 F.2d 598 (9th Cir. 1990).
 
 [10]
 

 In
 
 Russell v. United States,
 
 369 U.S. 749, 764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), the Court stated, “it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,— it must descend to particulars.” The Court continued:
 

 In an indictment based upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly,
 
 without any unceHainty or ambiguity,
 
 set forth all the elements necessary to constitute the offence intended to be punished. Undoubtedly, the language of the statute may be used in the general description of an offence,
 
 but it must be accompanied with such a statement of the fads and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.
 

 Id.
 
 at 765, 82 S.Ct. 1038 (internal citations and quotations omitted; emphasis added).
 

 In the context of a mail fraud prosecution, the objects of the scheme to defraud must be alleged with sufficient particularity so as to apprise the defendants of what they must be prepared to meet.
 
 Martinez,
 
 905 F.2d at 715 n. 4. For example, in
 
 United States v. Henry,
 
 29 F.3d 112 (3d Cir.1994), the court held that the government could
 
 not
 
 contend that a bid-rigging scheme defrauded the Delaware River Joint Toll Bridge Commission of its confidential business information and right to control how its money was invested where the indictment merely alleged that the defendants had defrauded other entities bidding for the public contracts “of money and property, in that [they] denied these other [entities! a fair and honest opportunity” to bid.
 
 Id.
 
 at 113. The court observed that “theories ... not advanced in the indictment ... cannot save it on appeal.”
 
 Id.
 
 at 114.
 

 In
 
 United States v. Telink, supra,
 
 an indictment charged the defendants with devising a scheme “to defraud and
 
 obtain money and property and deprive governmental entities of the honest and faithful service of employees,
 
 agents and consultants by means of false and fraudulent representations in connection with the sales of telecommunications equipment....” 702 F.Supp. at 806 (emphasis added). The court found that the charge of depriving the government of honest and faithful services of its employees defective under
 
 McNally.
 
 As to the charge of fraudulently obtaining “money and property,” the court rejected theories not articulated in the indictment, explaining:
 

 Following the
 
 McNally
 
 decision, it is apparent that a loss of money or proper
 
 *586
 
 ty is now a necessary element of a mail fraud charge. As such, a defendant is entitled to a specific description in the indictment of how his acts met this requirement. As the Supreme Court stated in
 
 Russell,
 
 “where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute.” The indictment in this case contains no explanation of how the defendants’ plan resulted in a property loss to the county.
 

 It is conceivable that the County might have lost money if the Telink company would have lowered its price, had it not offered private incentives to the governmental officials. However, it is not clear that this would have been the case. It is not obvious how a company will adjust its price and profit calculations on any given deal.
 
 Further, the indictment did not even mention such a theory, and the court should not concoct one
 
 now....
 
 An indictment must allege with specificity how the property loss occurred in order to safeguard constitutional rights guaranteed by the Fifth and Sixth Amendments.
 
 The Fifth Amendment provides the right to a grand jury indictment prior to trial, and it is quite possible in this case that the grand jury believed only that the defendants deprived the County of honest government, which is not a crime under McNally.... The Sixth Amendment provides the right of an accused to be informed of the nature of the charge against him, and the indictment fails in this regard as well.
 
 Money or property loss is an essential element of the crime, and this element is not described sufficiently to put the defendants on notice and to allow preparation of a defense.
 

 702 F.Supp. at 808-09. Thus, the mere fact that the indictment alleged a scheme to obtain “money and property” did not give the government free reign to define the alleged objects of the scheme.
 

 Russell
 
 was concerned that “[a] cryptic form of indictment ... requires the defendant to go to trial with the chief issue undefined. It enables his conviction to rest on one point and the affirmance of the conviction to rest on another. It gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture.”
 
 Id.
 
 This concern was echoed in
 
 United States v. Zauber, 857
 
 F.2d 137 (3d Cir.),
 
 cert. denied,
 
 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989), in which the court noted that “[i]t is settled law that nothing can be added to an indictment without the concurrence of the grand jury by which the bill was found.”
 
 Id.
 
 at 144 (internal citations and quotations omitted). After noting that “it is clear that the grand jury indicted the defendants for scheming to deprive the pension fund of its right to its employees’ ‘honest, faithful, prudent and diligent services’ by receiving kickbacks,” the court concluded that “[a]l-though Count One of the indictment alleges money or property loss, it is clear that the mail and wire fraud charges were based, and the jury solely instructed on, an intangible rights theory.”
 
 Id.
 
 Consequently, mail and wire fraud counts were stricken.
 

 The concerns expressed in
 
 Russell
 
 and
 
 Zauber
 
 are evident in this case. Essentially, the government is contending that the term “property” as used in the indictment means whatever may constitute property, without any specification by the Grand Jury. This contention ignores the fundamental proposition that an indictment provide
 
 fair
 
 notice of what the Grand Jury is charging. And when the statutory basis for an accusation uses such a capacious word as “property,” it is incumbent that the indictment “descend to the particulars” and say what species of property was the object of the scheme.
 

 In this case, the government posits that defendants concealed excess waste deposits to avoid having DEP revoke or otherwise adversely modify Empire’s waste disposal permit. This theory is nowhere
 
 *587
 
 advanced in the indictment. It would be sheer speculation to conclude that the grand jury regarded as an object of the scheme to defraud the Commonwealth’s residual property interest in a permit it had already issued.
 
 [11]
 

 Moreover, the indictment contains no references to Lackawanna County’s interest in scarce landfill space. At page 7 of its response to the defendants’ joint motion to dismiss the indictment, the government cites to paragraph 15 of the indictment when arguing that Lackawanna County’s interest in scarce landfill space constitutes a valid property interest. Presumably, the government contends that paragraph 15 gives defendants notice that Lackawanna County’s interest in scarce landfill space constitutes a property interest under the mail fraud statute. Paragraph 15 of the indictment merely asserts that defendants accepted waste in excess of Empire’s permit and in excess of what was reported to the DEP; it contains no reference to Lackawanna County, the scarcity of landfill space or preferences for local waste. Once again, it would be sheer speculation to conclude that when the Grand Jury charged defendants with scheming to deprive someone of property, it meant Lackawanna County’s interest in scarce landfill space.
 
 [12]
 

 Finally, the indictment does not assert that the Commonwealth’s interest in the information relating to the amount of waste accepted at the landfill constitutes a property interest under the mail fraud statute. Although the indictment does refer to the type of information contained in reports that landfills are required to submit to DEP, no reasonable inference that the Commonwealth had a property interest in that information can be inferred from the indictment. Accordingly, in the instant case, the Commonwealth’s interest in information that should have been contained in Empire’s reporting forms is not pled with sufficient detail to support a conviction under the mail fraud statute.
 
 [13]
 

 
 *588
 
 The government maintains that
 
 United States v. Olatunji, 872
 
 F.2d 1161 (3d Cir.1989), sanctions mail fraud indictments that merely contain the elements of the offense and repeat the statutory language. In
 
 Olatunji,
 
 our Court of Appeals stated that “[t]he indictment’s tracking language
 
 supplemented by specific allegations of the criminal activity
 
 appear entirely sufficient.”
 
 Id.
 
 at 1168 (emphasis added). In
 
 Olatunji,
 
 the indictment charged a scheme to defraud “to obtain student aid from the United States Department of Education.”
 
 Id.
 
 at 1163-64. Thus, the indictment specified the precise money or property at stake.
 
 Olatunji
 
 recognized, moreover, that an indictment must include a “ ‘sufficient factual orientation to permit the defendant to prepare his defense....’”
 
 Id.
 
 at 1166. As noted above, the Court in
 
 Russell
 
 reiterated that unless the statutory words express, “without any uncertainty or ambiguity,” the elements necessary to constitute the offense, an indictment that merely parrots the language of the criminal statute is not adequate. 369 U.S. at 765, 82 S.Ct. 1038.
 

 In this case, the term “property” is not so clear and unambiguous as to avoid the necessity of having to specify the property that was the object of the scheme to defraud. Moreover, the government should not be allowed to contend that forms of property not articulated in the indictment are the objects of the scheme to defraud, especially where, as here, the indictment specifies other forms of property — the statutory fees and contractual royalty obligations. Under the circumstances presented in this case, precluding the government from relying on forms of property not specified in the indictment is consistent with
 
 Olatunji
 
 and other applicable precedents.
 

 At trial, the government will not be permitted to rely on property interests not sufficiently pled as objects of the scheme to defraud. To allow the government to proceed in such a manner would expose the defendants to the danger of being convicted of mail fraud based upon property interests not considered by the Grand Jury. Moreover, the prosecution would then effectively be able to amend the indictment by asserting that - defendants’ scheme deprived its victims of property interests not considered by the Grand Jury. Finally, the indictment does not give defendants notice that these property interests could be the basis of the mail fraud charges, as required by
 
 Russell
 
 and its progeny. Accordingly, in the instant case, the Commonwealth’s interests in Empire’s permit and in the information contained in Empire’s reporting forms, and Lackawan-na County’s interest in scarce and valuable landfill space, may not be relied upon in presenting this case to the jury.
 

 
 *589
 
 D. The Sufficiency of the Indictment
 

 Defendants contend that “[t]he indictment as a whole should be dismissed .. because one or more of the property interests described in the indictment are not property interests. The indictment thus includes one or more legally impermissible bases, and the Court cannot amend the indictment, substituting its own determination for the basis of the grand jury’s decision to indict.” (Brf. in Support of Mot. to Dismiss at 2.) The government, on the other hand, contends that any of the above-referenced interests, if determined to constitute a property interest, are sufficient to sustain the indictment. (Response to Mot. to Dismiss at 3.)
 

 As a general rule, a mail fraud indictment charging multiple objectives is sufficient so long as one of the objectives pertains to a loss cognizable under § 1341, even if the indictment includes an objective that does not constitute “property.”
 
 See United States v. Turoff,
 
 701 F.Supp. 981, 985 (E.D.N.Y.1988). As recognized in
 
 United States v. Eckhardt,
 
 843 F.2d 989, 997 (7th Cir.),
 
 cert. denied,
 
 488 U.S. 839, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988):
 

 Where a fraud scheme involves multiple objectives, some of which are insufficient to state an offense under
 
 McNally,
 
 the remaining charge or charges will be deemed sufficient to state the offense if they are ‘easily’ separable from the charges deemed insufficient. In such a case, those allegations which are insufficient to state an offense are mere sur-plusage, and do not taint the remainder of the indictment.
 

 Our Court of Appeals has similarly sustained mail fraud indictments “despite references in the indictments, proofs, or instructions to violations of intangible rights,” where the scheme had the “inevitable result of effecting monetary or property losses.”
 
 United Stales v. Asher,
 
 854 F.2d at 1494. So long as the indictment does not focus solely on a non-cognizable loss, and the circumstances are such that the scheme had the inevitable result of effecting a cognizable loss, dismissal of the indictment is not warranted. See
 
 Martinez,
 
 905 F.2d at 715-16.
 

 In this case, the indictment does not concern only a non-cognizable loss or the deprivation of some intangible right that does not qualify as “property.” Although the largest dollar value item is the $100 per ton civil penalty, the statutory fees and royalty payments on the more than 70,000 tons of waste that the government contends were not disclosed in Empire’s reports are significant. The indictment plainly alleges that the purportedly fraudulent reports had the inevitable effect of reducing the fees and royalty payments that were otherwise due. Indeed, the Grand Jury could not have concluded that the defendants defrauded the Commonwealth of Pennsylvania of the $100 per ton penalty without also concluding that defendants deprived the state, county and private victims of fees and royalties.
 
 [14]
 
 Because every ton of trash that the defendants allegedly accepted in excess of the limits set by the landfill’s permit would have the inevitable result of depriving victims of their property rights, there is no danger that the Grand Jury could have relied solely on impermissible intangible rights.
 
 [15]
 
 Accordingly, the motion to dis
 
 *590
 
 miss the indictment will be denied.
 
 [16]
 

 E. Motions for Bills of Particulars
 

 On May 17, 1999, Michael Serafini moved for a bill of particulars. (Dkt. Entry 34.) Serafinfs motion sought supplementation of the indictment in the following areas: (1) the identity of co-conspirators and other unidentified participants in the alleged offenses. (Motion for Bill of Particulars, ¶¶ 1, 8, and 14.); (2) evidentiary details of the alleged conspiracy, including the first and last events of the conspiracy, the inception and termination of Serafim’s participation in the conspiracy, and the particular actions taken by Serafini in furtherance of the conspiracy
 
 (id.,
 
 ¶ 2-7, 9-10, and 13); (3) a statement of any overt acts purportedly performed by Serafini in furtherance of the conspiracy not specifically charged in paragraphs 21 through 39 of the indictment
 
 (id.,
 
 ¶ 6); and (4) the approximate amount of “excess” waste not reported to DEP and the dollar amount of fees and royalties and other payments allegedly avoided by Empire as a result of the alleged scheme to defraud.
 
 (Id.
 
 at ¶¶ 11-12.) Defendants Del Serra and Stephens moved separately for a bill of particulars, asking for an identification of the victims of the alleged mail fraud scheme and a description of the interests the government claims constitute the objects of the scheme. (Dkt. Entry 38.) Mariani has joined in the motion of Del Serra and Stephens. (Dkt. Entry 39.)
 

 Federal Rule of Criminal Procedure 7(f) allows a court to direct the filing of a bill of particulars.
 
 [17]
 
 “The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him [so that he, may] adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described defense.”
 
 United States v. Addonizio,
 
 451 F.2d 49, 63-64 (3d Cir.1971) (quoting
 
 United States v. Tucker,
 
 262 F.Supp. 305, 308 (S.D.N.Y.1966)),
 
 cert. denied,
 
 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972);
 
 see also Rosa,
 
 891 F.2d at 1066;
 
 United States v. Adams,
 
 759 F.2d 1099, 1113 (3d Cir.),
 
 cert. denied,
 
 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985);
 
 United States v. McDade,
 
 827 F.Supp. 1153, 1187 (E.D.Pa. 1993),
 
 aff'd in part, appeal dismissed in part,
 
 28 F.3d 283 (3d Cir.1994),
 
 cert. denied,
 
 514 U.S. 1003, 115 S.Ct. 1312, 131 L.Ed.2d 194 (1995);
 
 United States v. Joseph,
 
 510 F.Supp. 1001, 1005 (E.D.Pa. 1981).
 

 A bill of particulars, however, is not intended to provide the defendant with the fruits of the government’s investigation, but is instead intended to give the
 
 *591
 
 defendant the minimum amount of information necessary to permit the defendant to conduct his own defense.
 
 United States v. Smith,
 
 776 F.2d 1104 (3d Cir. 1985);
 
 see Sourlis,
 
 953 F.Supp. at 579 (holding that a bill of particulars, unlike discovery, is not intended to provide the defendant with the results of the government’s investigation);
 
 Caruso,
 
 948 F.Supp. at 393 (same);
 
 United States v. Giampa,
 
 904 F.Supp. 235, 280 (D.N.J.1995) (“Although Rule 7(f) is construed liberally, it does not permit defendant to receive wholesale discovery of the Government’s evidence.”);
 
 McDade,
 
 827 F.Supp. at 1153 (same);
 
 Joseph,
 
 510 F.Supp. at 1005 (same). A bill of particulars should be granted where the indictment is too vague or indefinite to reasonably allow a defendant to prepare his defense.
 
 See Addonizio,
 
 451 F.2d at 64;
 
 Giampa,
 
 904 F.Supp. at 280;
 
 United States v. Nacrelli,
 
 468 F.Supp. 241, 250 (E.D.Pa.1979),
 
 aff'd mem.,
 
 614 F.2d 771 (3d Cir.1980);
 
 United States v. Feliziani,
 
 472 F.Supp. 1037, 1045 (E.D.Pa.1979),
 
 aff'd mem.,
 
 622 F.2d 580 (3d Cir.1980);
 
 United States v. Bloom,
 
 78 F.R.D. 591, 599 (E.D.Pa.1977). As summarized by the Third Circuit:
 

 A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government’s investigation. Rather, it is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his
 
 own
 
 investigation.
 

 Smith,
 
 776 F.2d at 1111 (citations omitted) (emphasis in original);
 
 see also Caruso,
 
 948 F.Supp. at 393 (finding that an indictment must only provide a minimal amount of information that allows a defendant to conduct his or her own investigation).
 

 In determining whether to grant a motion for a bill of particulars, a trial court must strike a “prudent balance” between the defendant’s interest in securing information and the government’s interest in not committing itself to facts before it is in a position to do so.
 
 Rosa,
 
 891 F.2d at 1066.
 
 [18]
 
 Granting a bill of particulars is a matter within the broad discretion of the trial court.
 
 United States v. Eufrasio,
 
 935 F.2d 553, 575 (3d Cir.),
 
 cert. denied,
 
 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991). As the Third Circuit has explained:
 

 [TJrial judges must be allowed to exercise broad discretion in order to strike a prudent balance between the defendant’s legitimate interest in securing information concerning the government’s case and numerous countervailing considerations ranging from the personal security of witnesses to the unfairness that can result from forcing the government to commit itself to a specific version of the facts before it is in a position to do so.
 

 Rosa,
 
 891 F.2d at 1066.
 

 The indictment in this case covers a time period from 1989 through January 22, 1997. Defendants and unidentified co-conspirators are charged with directing unnamed Empire employees to accept thousands of tons of solid waste in excess of that which was reported to DEP and others. The indictment refers to unnamed weighmasters, Empire’s “accounting department,” and its “upper management.”
 

 Serafmi seeks an identification of those who comprised “upper management” as that term is used in the indictment, the persons in the accounting department and weighmasters used in the scheme to defraud, and others whom the government contends were defendants’ co-conspirators. The government contends that defendants do not need an identification of others involved in the scheme because they are all
 
 *592
 
 known to the defendants. (Response to Michael Serafini’s Motion for a Bill of Particulars at 5.)
 

 I am satisfied that Michael Serafini has established a need for identification of co-conspirators and other participants in the alleged scheme to defraud. As noted above, the conspiracy lasted approximately seven years. The government contends that unindicted co-conspirators were involved, but identifies only three categories of purported participants — weighmasters, accounting personnel, and “upper management.” Which weighmasters and members of the accounting department may have been involved are not specified. Nor does the indictment indicate who comprised “upper management.” Under these circumstances, defendants cannot know with certainty whom the government contends were involved in the fraudulent scheme. In similar circumstances, disclosure of co-conspirators and other participants in alleged offenses has been required. See,
 
 e.g., United States v. Trie,
 
 21 F.Supp.2d 7, 22 (D.D.C.1998);
 
 United States v. Ahmad,
 
 53 F.R.D. 194, 199 (M.D.Pa.1971). The government has not advanced any countervailing consideration, such as concerns for the security of those identified or witness tampering, sufficient to overcome Serafini’s demonstration of need for this information. Accordingly, the government will be required to file a bill of particulars that provides the information requested in paragraphs 1, 8 and 14 of Serafim’s Motion for Bill of Particulars.
 
 [19]
 

 Serafim’s other requests for information plainly transcend the purposes of a bill of particulars and amount to an attempt to secure discovery and restrict the government’s presentation of evidence at trial. Our Court of Appeals has recognized that a request for overt acts not alleged in the indictment, as set forth in 1f 6 of Serafini’s motion, is “tantamount to a request for ‘wholesale discovery of the government’s evidence,’ which is not the purpose of a bill of particulars----”
 
 United States v. Armocida,
 
 515 F.2d 49, 54 (3d Cir.),
 
 cert. denied,
 
 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Evidentiary details pertaining to the inception and termination of the alleged conspiracy and the particular defendant’s participation therein need not be required of the government.
 
 See United States v. Giampa,
 
 904 F.Supp. at 279-80. In this regard, it is uncontradicted that the government has provided voluminous discovery material in this case. Of course, “[i]n considering whether a bill of particulars is appropriate, the court may consider not only the indictment, but also all of the information that has been made available to the defendant.”
 
 Gatto,
 
 746 F.Supp. at 477. As to the amount of waste not reported to DEP and the approximate dollar amount of the fees and royalties thereby avoided by Empire, the government has provided information as to its method of calculating the reporting errors and has quantified the approximate amount of un
 
 *593
 
 reported waste. A bill of particulars for this type of information is, therefore, unnecessary.
 

 As to the request of Del Serra, Stephens and Mariani for an identification of the alleged victims of the purported scheme to defraud and an identification of the objects of the scheme to defraud, the government has provided this information in responding to the motions to dismiss. There is, therefore, no need for a bill of particulars as to this information as well.
 

 In summary, the government will be required to provide a bill of particulars that identifies co-conspirators and other participants in the alleged scheme. In all other respects, however, the motions for bills of particulars will be denied.
 

 F. Defendants’ Joint Motion to Compel Discovery
 

 On November 9, 1999, the defendants filed a joint motion to compel discovery (Dkt. Entry 59), seeking to require the government to disclose (1) its methodology for calculating any alleged undeclared excess tonnage of waste disposed of at Empire; (2) the identity of its “regulatory” expert; and (3) its exhibit list at a certain time before the scheduled trial date. Defendants also seek a determination that DEP is part of the “prosecution team” so that the government’s
 
 Brady
 
 and Jencks Act obligations extend to DEP files. Each of these matters will be addressed separately.
 

 At oral argument, the government represented that it calculated alleged undeclared excess tonnage of waste by comparing Empire’s billing records with its submissions to DEP. (Tr. of Dec. 10, 1999 Oral Arg. at 25.) Accordingly, as the government has already disclosed how it calculated the alleged unreported waste, defendants’ motion to compel disclosure of the methodology of calculating unreported waste is moot.
 

 Defendants assert that the government should bear the burden of disclosing exculpatory and impeachment material that is contained within the files of DEP. (Jt.Mot. to Compel Discovery at unnumbered 5-7.) They cite
 
 United States v. Joseph,
 
 996 F.2d 36 (3d Cir.),
 
 cert. denied,
 
 510 U.S. 937, 114 S.Ct. 357, 126 L.Ed.2d 321 (1993), for the proposition that “information within the files or knowledge of any agency which is ‘readily accessible’ to the government, including state and local government agencies, will be brought within the government’s discovery obligation under
 
 Brady v. Maryland
 
 and the Federal Rules of Criminal Procedure.” (Jt.Mot. to Compel Discovery at 5.) Claiming that DEP is “closely and inextricably linked with the government” and that the DEP files are readily accessible to the Department of Justice, defendants assert that the government should bear the burden of producing any exculpatory and impeachment material located within DEP’s files.
 
 (Id.
 
 at 6-7.)
 

 In
 
 United States v. Perdomo,
 
 929 F.2d 967, 970-71 (3d Cir.1991), and
 
 United States v. Joseph,
 
 996 F.2d at 40-41, our Court of Appeals held that where information is “readily available” to a prosecutor who knows or should know of the exculpatory material, the prosecutor is obliged to disclose that information under
 
 Brady,
 
 even if the information is in possession of some other arm of the state.
 
 Perdomo
 
 also cautioned, however, “that
 
 Brady
 
 does not oblige the government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence.” 929 F.2d at 973. At oral argument, counsel for Del Serra conceded that the
 
 public
 
 records of the DEP are equally accessible to the defendants as they are to the government. (Tr. of Dec. 10, 1999 Oral Arg. at 59.) However, defendants further asserted that exculpatory material may exist in non-public DEP documents.
 
 (Id.
 
 at 59-60.)
 

 In
 
 Joseph,
 
 the Third Circuit stated that it would “not interpret
 
 Brady
 
 to require prosecutors to search their unrelated files to exclude the possibility, however remote,
 
 *594
 
 that they contain exculpatory information. Such a requirement would place an unreasonable burden on prosecutors for it is one thing to require honest searches, reasonable in scope, of unrelated files for specific identifiable information, but quite another to send prosecutors on open-ended fishing expeditions.”
 
 Joseph,
 
 996 F.2d at 41. In
 
 Perdomo,
 
 however, the court adopted the reasoning of the Fifth Circuit, which had refused “to draw a distinction between different agencies under the same government, focusing instead upon the ‘prosecution team’ which includes both investigative and prosecutorial personnel.”
 
 Perdomo,
 
 929 F.2d at 970. Thus, there is a duty to search and disclose material found in agencies involved in the investigation or prosecution of the defendant.
 
 See Odle v. Calderon,
 
 65 F.Supp.2d 1065, 1071-72 (N.D.Cal.1999)
 

 Defendants assert that they have made a threshold showing that DEP is so closely aligned with the government in the prosecution of the instant case as to be part of the “prosecution team.” (Tr. of Dec. 10, 1999 Oral Arg. at 57-60.) The government disputes this assertion, observing that merely because DEP lost revenue because of the alleged scheme to defraud does not make it part of the prosecution team.
 

 “Whether a particular government agency will be considered a part of the prosecution depends on its level of involvement and cooperation with the prosecuting agency.” Od
 
 le,
 
 65 F.Supp.2d at 1072. It has been recognized that a federal agency charged with administering a statute which consults with a federal prosecutor in the steps leading to the prosecution is a part of the prosecution team for purposes of determining what information must be disclosed to a person charged with violating that statute.
 
 See United States v. Wood,
 
 57 F.3d 733, 737 (9th Cir.1995). Defendants have not offered any evidence that DEP has participated in this prosecution or actively cooperated with the prosecutor. (Response to Jt.Mot. to Compel Discovery at 10.) Defendants’ unsupported contention that the government and DEP are working as part of the same prosecution team in the instant case is not sufficient to draw into question the government’s contention that DEP is most appropriately characterized as a victim of defendants’ crime. (Response to JtMot. to Compel Discovery at 10.)
 
 [20]
 
 Accordingly, the government is not required to search DEP’s files for the existence of exculpatory and impeachment material.
 
 See United States v. Avellino,
 
 136 F.3d 249, 255-56 (2d Cir.1998)(prosecution has no duty to inquire of other offices not working with the prosecutor on the case in question);
 
 United States v. Morris,
 
 80 F.3d 1151, 1169 (7th Cir.),
 
 cert. denied,
 
 519 U.S. 868, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996)(no duty to learn of information possessed by other government agencies not involved in the investigation or prosecution at issue).
 

 In its response to defendants’ motion to compel discovery, the government averred that if it “decides to use an expert witness to explain the regulatory framework under which Empire operated, its disclosures will be made promptly pursuant to Rule 16(a)(1)(E).” (Response to JtMot. to Compel Discovery at 14.) Defendants have not asserted a compelling reason why the government should be forced at this time to determine if it will use an expert to explain the regulatory framework under which Empire operated. Accordingly, as the government has acknowledged its obligations under Rule 16(a)(1)(E), defendants’ motion to compel will be denied as it seeks such a disclosure.
 

 
 *595
 
 Finally, defendants seek an order directing the government to disclose its exhibits more than ten days in advance of any trial date that might be set. (Jt.Mot. to Compel Discovery at unnumbered 2, 8.) This Court’s Pretrial Order directs that “[t]he government shall pre-mark all exhibits which it intends to introduce as part of its direct case and shall permit the attorney for the defendant to inspect and copy these exhibits no later than ten (10) days prior to the commencement of the trial.” (Dkt. Entry 25 at 5.) Defendants have not asserted any compelling reason for changing the timetable set in that Order. Accordingly, defendants’ motion to compel will be denied as it seeks to modify the government’s obligations with regard to the disclosure of exhibits as set forth in this Court’s Pretrial Order.
 

 III. CONCLUSION
 

 Under
 
 McNally
 
 and its progeny, the government may only derive the benefits of the mail fraud statute where the defendants’ alleged scheme to defraud deprived the government of money or its property. In the instant case, the indictment’s allegations that defendants’ scheme deprived the Commonwealth, other government entities and FMKF of fees and royalties are sufficient to show losses cognizable under the mail fraud statute. However, the government has not shown that the Commonwealth possesses an unasserted civil penalty as a property holder. As the penalty appears to be discretionary and is plainly ancillary to the state’s regulatory power, the alleged scheme to avoid the penalty did not implicate a loss cognizable under the mail fraud statute. Moreover, the government will not be permitted to rely on those interests not specifically set forth in the indictment — Pennsylvania’s interests in Empire’s permit and in the information contained in Empire’s reporting forms, and Lackawanna County’s interest in scarce and valuable landfill space — so that the defendants will not face the possibility of being convicted of mail fraud based upon property interests not clearly considered by the Grand Jury.
 

 Third Circuit precedent directs that an indictment is not fatally deficient where the inevitable result of the scheme is to effect a monetary or property loss and it is impossible to hypothesize a set of circumstances under which the jury could conclude that the defendants schemed to defraud the victim of intangible rights that are not the proper basis for a mail fraud without also having found that the scheme deprived the victim of property or money. In the instant case, even if the Grand Jury based its indictment on intangible rights as opposed to property, it could not have done so without also concluding that the defendants schemed to deprive the Commonwealth, other governmental entities and FMKF of money or property. As the inevitable result of defendants’ scheme was to deprive the scheme’s victims of concrete economic benefits, defendants’ motion to dismiss will be denied.
 

 Because the indictment provides defendants with the minimum amount of information necessary to permit them to conduct their defense, defendants’ motions for bills of particulars will be denied, with the exception that the government must disclose the identity of co-conspirators and others involved in the alleged scheme. Finally, defendants have not presented good cause to modify the time frames for the government to disclose its expert witnesses and the exhibits it intends to use at trial set forth in this Court’s Pretrial Order and Federal Rule of Criminal Procedure 16(a)(1)(E). Moreover, defendants have not established that DEP is a part of the prosecution team. Accordingly, defendants’ motion to compel discovery will be denied. An appropriate order follows.
 

 [1]
 

 . Defendants also argue that the application of the mail fraud statute to the facts alleged in the indictment violates the sovereignty of the Commonwealth of Pennsylvania, and accordingly is a violation of the Tenth Amendment to the Constitution of the United States. (Brf. in Support of Mot. to Dismiss at 16-25.) Relying on
 
 United States v. Lopez, ,
 
 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995),
 
 McNally v. United States, supra, United States v. Bucuvalas,
 
 970 F.2d 937 (1st Cir.1992),
 
 cert. denied,
 
 507 U.S. 959, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993), and
 
 New York v. United States,
 
 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), defendants assert that the federal government does not have the power to direct the Commonwealth to enforce its regulatory scheme.
 
 (Id.)
 
 Defendants further contend that the federal government has stepped in and compelled the enforcement of the Commonwealth’s regulations regarding landfills.
 
 (Id.
 
 at 20.)
 

 Defendants misstate the scope and effect of the federal government's criminal investigation. The federal government has an interest in protecting the United States mails from being used as an instrument of fraud. The instant criminal prosecution was brought to protect that interest. Defendants contend that
 
 McNally
 
 “relied upon federalism concerns in its interpretation of the mail fraud statute.” (Brf. in Support of Mot. to Dismiss at 17.) However, the language defendants quote from
 
 McNally,
 
 which limits the applicability of the mail fraud statute to the protection of property rights, does not preclude the federal government from pursuing a mail fraud prosecution merely because state property interests are implicated. While the Court’s decisions in
 
 Lopez,
 
 and
 
 New York v. United States
 
 were based on federalism concerns, defendants have failed to indicate how the Commerce Clause analyses articulated in those cases are relevant to the instant case. Moreover, the Supreme Court’s rationale in
 
 New York v. United States
 
 — that the federal government cannot compel the states to enforce their own regulations — is not implicated in the instant case as this action does not force the Commonwealth to enforce its regulatory scheme, nor does this action preclude the enforcement of that scheme through an action to recover fees and penalties associated with the tons of solid waste allegedly accepted by Empire in excess of the limits set in its permit. Furthermore,
 
 United Stales v. Bucu-valas,
 
 which is also cited by defendants, actually supports rejection of their argument as the First Circuit affirmed defendants’ convictions for scheming to obtain by fraud entertainment and liquor licenses in which local governments held proprietary interests. Finally, as persuasively noted by the government, defendants have failed to cite one case where a mail fraud indictment was dismissed on federalism grounds. Accordingly, defendants’ federalism challenge lacks merit.
 

 [2]
 

 . In 1988, Congress amended the mail fraud statute by adding 18 U.S.C. § 1346. Section 1346 states, ”[f]or the purposes of this chapter, the term 'scheme to defraud’ includes a scheme or artifice to defraud another of the intangible right of honest services.”
 

 [3]
 

 . The indictment also referenced a $.20 per ton fee payable to the Riverside School District. This fee, however, was capped at $125,-000 per year. The government concedes that the Riverside School District received the maximum amount each year. Accordingly, absent proof that the fee and cap were negotiated on the basis of fraudulently reported figures, the government has no basis for contending that an object of the scheme to defraud was to deprive Riverside School District of money or property.
 

 [4]
 

 . Defendants concede that the royalty payment due FMKF is a "property interest.” (Brf. in Support of Mot. to Dismiss at 28.) The fact that the per ton fees were mandated by statute and payable to governmental entities does not alter the fact that, as in the case of the FMKF royalties, the recipients of those fees were deprived of money to which they were entitled when Empire accepted waste.
 

 [5]
 

 . Indeed, the government has not proffered any evidence that DEP has commenced penalty assessment proceedings for the alleged acceptance of waste in excess of daily limits at issue here. It is troubling that what the government asserts is a
 
 mandatory
 
 penalty remains unimposed several years after the discovery of the alleged fraud.
 

 [6]
 

 . The discretionary aspect of the civil penalty is the primary characteristic distinguishing it from the fees discussed above. Those fees accrue upon the deposit of waste at the landfill. The penalty, however, does not accrue until assessed, and it appears that DEP has discretion as to whether to assess the penalty. In other words, the Commonwealth does not have a property interest in the penally until and unless it is assessed. This situation is to be distinguished from a decision not. to collect a fee. In the latter circumstance, the Commonwealth has elected not to enforce a property right. In the context of a civil penalty, the Commonwealth has elected not to create a property right.
 

 [7]
 

 . Thus, fraud to avoid payment of an assessed penalty could support a mail fraud prosecution because the act of assessment may vest in the state a property interest in the amount of the assessment, but fraud to avoid the assessment itself implicates only the state's interests as a regulator.
 

 [8]
 

 . This decision does not necessarily preclude the government from arguing to the jury that a motive for the alleged fraudulent scheme was to avoid the civil penalty enforcement mechanism. A fraudulent scheme may, of course, have multiple objectives. As explained at page 26 of the text above, to be actionable under the mail fraud statute, it is enough that only one of those objectives be the deprivation of money or property from the victims. In this case, the indictment adequately places defendants on notice that an alleged object of the scheme was the avoidance of the civil penalty mechanism. A definitive ruling on the admissibility of such evidence, however, need not be made at this time.
 

 [9]
 

 . By contrast, the indictment specifically references the fees, royalties, and civil penalty that the government contends constitute valid property interests under the mail fraud statute and which were objects of the fraudulent scheme. The indictment alleges that these fees, royalties and penalty were based upon the tonnage of solid waste reported to have been disposed of at the landfill and that defendants schemed to accept waste in excess of its permit limits without reporting that waste to the DEP. Accordingly, defendants had notice that the government was asserting that the victims of their scheme were deprived of the fees, royalties and penalty referred to in the indictment.
 

 [10]
 

 . The Fifth Amendment, in part, provides: “No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury. ...” The Sixth Amendment., in part, provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation.”
 

 [11]
 

 . If the indictment had specifically indicated that an object of the scheme was to appropriate the Commonwealth’s property interest in Empire's permit, an analysis of whether the government’s theory implicated a loss cognizable under the mail fraud statute would be guided by
 
 United States v. Martinez, supra.
 
 As
 
 noted
 
 above,
 
 Martinez
 
 held that the Commonwealth had a property interest in an unissued medical license.
 
 Id.
 
 at 715. In the instant case, the Commonwealth has the authority to suspend, modify, or revoke any permit or license if it finds that the permittee has violated state law.
 
 See
 
 35 P.S. § 6018.53(c). In light of the Third Cii'euit’s guidance that the mail fraud statute is to be read as broadly protecting property rights, the Commonwealth's interest in ihe operating permit in the instant case would appear to be that of a property holder under the mail fraud statute.
 
 See United States v. Bucuvalas,
 
 970 F.2d 937 (1st Cir.),
 
 cert. denied,
 
 507 U.S. 959, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993) (holding that City of Boston has property interest in issued axxd unissxxed licenses).
 

 [12]
 

 . It does not necessarily follow that, because oix specific dates Empire accepted waste above its daily limits, Lackawanna County was deprived of scarce landfill space. The County’s legitimate expectation would be that Empire would not accept more waste than allowed during the time frame covered by the permit. Thus, if on average Empire had not accepted more waste than allowed under its permit, Lackawanna County would not have lost any interest it. had in valuable landfill space.
 

 [13]
 

 . Even if the indictment had specifically alleged that the Commonwealth had a property interest in the information that was supposed to be contained in Empire’s reporting forms, such an interest would not constitute a property interest under the mail fraud statute. The government argues that the "Commonwealth was ... deprived of the information that should have been contained its repotting forms (the amount of waste accepted at the landfill) and that this information was crucial to enforcing its regulations.” (Response to Mol. to Dismiss at 17.) Thus, while contending in that the information is property for the purposes of
 
 McNally,
 
 the government’s assertion recognizes that the information that the defendants’ scheme allegedly deprived the Commoixwealth of directly implicates the Commonwealth’s role as a regulator. Fn this regard, the government's interest here is distinguishable from the Wall Street Journal’s interest in
 
 Carpenter.
 
 In
 
 Carpenter,
 
 the information in question was confidential business information, which has long been recognized as property.
 
 Carpenter,
 
 484 U.S. at 26, 108
 
 *588
 
 S.Ct. 316. Moreover, the information in
 
 Carpenter
 
 was property because the Wall Street Journal is in the business of collecting and selling that information.
 
 Id.
 
 at 220-21. In the instant case, the information itself was never the property of the Commonwealth. The information that the defendants’ scheme allegedly deprived the Commonwealth of was to be compiled by the defendants. The Commonwealth was not deprived of "exclusive” use of the information, as was the Journal in
 
 Carpenter.
 
 Here, the government is in essence contending that the Commonwealth was deprived of a full and fair accounting of the waste accepted at the Empire landfill. This interest is regulatory, rather than proprietary, in nature, and therefore would not constitute property of the Commonwealth under the mail fraud statute.
 

 Moreno
 
 v.
 
 Story,
 
 694 F.Supp. 1557 (S.D.Fla. 1988), on which the government relies and which held that failure to provide information on IRS Currency Transaction Reports could support a mail fraud prosecution, is not persuasive. The decision in that case did not explain how the information constitutes government property. Those cases that have addressed the issue in a more comprehensive manner have concluded that a mail fraud prosecution may not be premised solely on the theory that the government has been deprived of information to which it was entitled in its regulatory capacity.
 
 See, e.g., United States v. Gimbel,
 
 830 F.2d 621, 626-27 (7th Cir.1987);
 
 United States v. Herron,
 
 825 F.2d 50, 57 (5th Cir.1987). I find these decisions compelling. Information to be supplied to a state is
 
 not
 
 the state’s property.
 

 [14]
 

 . Because the indictment plainly discloses cognizable losses that would be the natural effect of the alleged scheme to defraud, there is no need to examine Grand Jury transcripts. The indictment, on its face, is sufficient to assure that the Grand Jury acted on the basis of a cognizable loss effected by the scheme to defraud. Stated otherwise, the fact that the indictment discloses a non-cognizable loss (the civil penalty) does not overcome the presumption of regularity accorded Grand Juiy proceedings.
 
 See United Slates v. Educational Development Network Corp.,
 
 884 F.2d 737, 740 (3d Cir.),
 
 cert. denied,
 
 494 U.S. 1078, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990).
 

 [15]
 

 .
 
 United States v. D’Alessio,
 
 822 F.Supp. 1134 (D.N.J.1993), cited by defendants and which dismissed an indictment because it relied upon a court rule prohibiting acceptance of gifts by court employees that did not apply to the indicted sheriff, is not applicable here.
 
 *590
 
 Nor does this case present the danger of melding separate transactions involving unrelated persons into a single conspiracy charged in the same count of an indictment.
 
 See United States v. Cryan,
 
 490 F.Supp. 1234 (D.N.J.),
 
 aff'd,
 
 636 F.2d 1211 (3d Cir.1980). The multiple objectives charged in the indictment flow from a series of related transactions involving the same persons and victims. Nor is this a case like
 
 Dunn v. United States,
 
 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979), where the government sought to sustain a perjury conviction on the basis of testimony given at a court proceeding that was not charged in the indictment. On the contrary, this case falls squarely within holdings such as
 
 Eckhardt, Asher
 
 and
 
 Martinez,
 
 which have recognized that the inclusion of a loss outside the purview of the mail fraud statute does not destroy an otherwise valid indictment.
 

 [16]
 

 . The only non-cognizable loss mentioned in the indictment pertains to the $100 per ton civil penalty. This fact may be relevant to the issue of fraudulent intent.
 
 See United States v. Mangiardi,
 
 962 F.Supp. 49, 53 (M.D.Pa. 1997),
 
 aff'd mem.,
 
 202 F.3d 255 (3d Cir.1999). As noted above, there is no need to decide this issue at this time. Accordingly, there is also no need to decide, at this time, whether the indictment should be redacted.
 

 [17]
 

 . Prior to 1966, a moving party had to dem- ■ onstrate cause in order to obtain a bill of particulars.
 
 United States v. Rosa,
 
 891 F.2d 1063, 1066 (3d Cir.1989). The 1966 amendment to Rule 7(0 took a more liberal attitude by eliminating the cause requirement.
 
 Id.; see also United States v. Sourlis,
 
 953 F.Supp. 568, 578 (D.N.J.1996);
 
 United States v. Caruso,
 
 948 F.Supp. 382, 393 (D.N.J.1996).
 

 [18]
 

 . The bill of particulars is designed to define and limit the government’s case. Generally, when a bill of particulars is furnished to a defendant., the government is strictly limited at time of trial to the particulars which it has specified.
 
 See Smith,
 
 776 F.2d at 1111;
 
 United States v. Neff,
 
 212 F.2d 297, 309 (3d Cir.1954);
 
 United States v. Haskins,
 
 345 F.2d 111 (6th Cir.1965).
 

 [19]
 

 . In another matter pending before this Court,
 
 United States v. Mariani,
 
 7 F.Supp.2d 556, 560-61 (M.D.Pa.1998), I declined to require the government to identify unindicted co-conspirators. In that case, however, the indictment had provided the names of others purportedly involved in the alleged illegal activity. Moreover, the time period at issue in that case was much narrower than that involved here. Under these circumstances, I did not believe that it was necessary for the government to make legal conclusions as to whether numerous identified individuals on the periphery of the alleged scheme to evade campaign contribution laws were co-conspirators in order to enable the preparation of an adequate defense. Here, by way of contrast, the indictment only provides a description of other persons involved (and in the case of the phrase "upper management,” a somewhat ambiguous description at that). The necessity for a bill of particulars must be considered in the context of the particular indictment and other circumstances at issue. " ‘The test in passing on a motion for a bill of particulars should be whether it is necessary that defendant have the particulars sought in order to prepare his defense and in order that prejudicial surprise will be avoided.’ ”
 
 Ahmad,
 
 53 F.R.D. at 199. In this case, I find that identification of persons is needed to enable Serafi-ni to prepare his defense and to avoid prejudicial surprise. These circumstances were not present in the first
 
 Mariani
 
 action.
 

 [20]
 

 . Defendants' assertion that “DEP has, based upon information learned, by the defense, cooperated with the government in developing a methodology for calculating any overage,” (Jt.Mot. to Compel Discovery at unnumbered 4), is directly contradicted by the government’s disclosure of its methodology and Assistant United States Attorney Bran-dler’s contentions that DEP and the government are not working together in this matter. (Tr. of Dec. 10, 1999 Oral Arg. at 25, 29-30.)